IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARLETTE E. THOMAS and KATHRYN A.  :  CIVIL ACTION
THOMAS, as Co-Executors of the Estate of  :
JAMES A. THOMAS, Deceased, and on Behalf :
of All Surviving Next of Kin and MARLETTE E. :
THOMAS and KATHRYN A. THOMAS,  :
Individually and in Their Own Right   :
15021 Bonnair Road      :
Glen Rock PA 17327      :
            :
    and       :
            :
FRANCIS N. KUHN a/k/a FRANCIS W. KUHN :
and MARY ANN KUHN, as Co-Executors of the :
Estate of JODY A. LAUGHMAN, Deceased, and :  JURY TRIAL DEMANDED
on Behalf of All Surviving Next of Kin and :
FRANCIS N. KUHN a/k/a FRANCIS W. KUHN :
and MARY ANN KUHN, Individually and in  :
Their Own Right      :
226 Princess Street      :
Hanover PA 17331      :
            :
    and       :
            :
RORY L. LAUGHMAN, as Administrator of the :
Estate of NICOLE L. LAUGHMAN, Deceased, :
and on Behalf of All Surviving Next of Kin and :
RORY L. LAUGHMAN, Individually and in His :
Own Right       :
319 Eagle Avenue      :
Hanover, PA  17331      :
            :
    Plaintiffs,    :
            :
    v.      :
            :
K&S HELICOPTERS, INC.;    :
K&S HELICOPTERS, INC. d/b/a TROPICAL :
HELICOPTERS; CALVIN G. DORN  :
73-4345 Paani Place      :
Kailua-Kona, HI  96740     :
            :
    and       :  NO.

JOSEPH EDWARD ZAREMBA; and JOSEPH   :
EDWARD ZAREMBA d/b/a PACIFIC TURBINE; :
PACIFIC TURBINE, INC.   :
73-4344 Pahee Place   :
Kailua-Kona, HI  96740   :
   :
   and   :
   :
TINA HOLLIDAY, Special Administrator of the   :
Estate of RUSSELL TIMOTHY HOLLIDAY,   :
Deceased   :
2608 – 41st Street SE   :
Puyallup, WA  98374   :
   :
   and   :
   :
ACTIVITY INFORMATION CENTER, INC.; and :
ACTIVITY INFORMATION CENTER, INC.   :
d/b/a HAWAII ACTIVITY WORLD   :
c/o National Registered Agents of HI, Inc.   :
1136 Union Mall, Suite 301   :
Honolulu, HI  96813   :
   :
   and   :
   :
EXTEX, EXTEX LTD.; and EXTEX LTD, LLC   :
1383 N. Tech Blvd.   :
Gilbert, AZ  85012   :
   and/or   :
c/o CT Corporation   :
3225 N. Central Avenue   :
Phoenix, AZ  85012   :
   :
   and   :
   :
EXTEX INVESTORS, INC.   :
c/o ACFB Incorporated   :
200 Public Square, #2300   :
Cleveland, OH  44114   :
   :
   and   :
   :
LARRY SHIEMBOB   :
1383 N. Tech Blvd.   :
Gilbert, AZ  85012   :

2

and                                                    :
                                                       :
SUPERIOR AIR PARTS, INC.                               :
621 S. Royal Lane, Suite 100                           :
Coppell, TX  75019                                     :
        and/or                                         :
c/o CT Corporation System                              :
1515 Market Street, Suite 1210                         :
Philadelphia, PA  19102                                :
                                                       :
and                                                    :
                                                       :
ROLLS-ROYCE CORPORATION;                               :
ROLLS-ROYCE ENGINE COMPANY;                            :
ROLLS-ROYCE ENGINE SERVICES;                           :
ALLISON ENGINE COMPANY, INC. d/b/a                     :
ROLLS ROYCE-ALLISON; and ALLISON                       :
ENGINE COMPANY                                         :
c/o Corporation Service Co.                            :
251 E. Ohio Streeet, Suite 500                         :
Indianapolis, IN  46204                                :
                                                       :
and                                                    :
                                                       :
GENERAL MOTORS CORPORATION,                            :
ALLISON GAS TURBINE DIVISION                           :
c/o Corporation Service Co.                            :
251 E. Ohio Streeet #500                               :
Indianapolis, IN  46204                                :
                                                       :
and                                                    :
                                                       :
GENERAL MOTORS                                         :
CORPORATION, DETROIT DIESEL ALLISON                    :
DIVISION; and GENERAL MOTORS                           :
CORPORATION                                            :
c/o The Corporation Company                            :
30600 Telegraph Road                                   :
Bingham Farms, MI  48025                               :
                                                       :
and                                                    :

MD HELICOPTERS, INC.                                          :
c/o David W. Kash, Esquire                                    :
Jennings Strouss & Salmon                                     :
201 E. Washington Street, 11th Floor               :
Phoenix, AZ  85004-2385                                       :
                                                             :
              and                                            :
                                                             :
MD HELICOPTERS B.V.; RDM HOLDING(S)                           :
INC.; and MD HELICOPTER HOLDINGS, INC.,                       :
a subsidiary of RDM HOLDINGS, INC.                            :
c/o Ronald D. Moore                                          :
7828 E. Oak Shore Drive                                      :
Scottsdale, AZ   85258                                       :
                                                             :
              and                                            :
                                                             :
MD HELICOPTERS USA, INC.                                      :
c/o The Corporation Trust Co.                                :
Corporate Trust Center                                       :
1209 Orange Street                                           :
Wilmington, DE  19801                                        :
                                                             :
              and                                            :
                                                             :
HUGHES HELICOPTER COMPANY                                     :
c/o McDonnell Douglas Helicopter Company                     :
c/o Corporation Service Company                              :
2338 W. Royal Palm Road, Suite J                             :
Phoenix, AZ  85012                                           :
                                                             :
              and                                            :
                                                             :
MCDONNELL DOUGLAS CORPORATION;                                :
MCDONNELL DOUGLAS HELICOPTER                                  :
COMPANY; MCDONNELL DOUGLAS                                    :
HELICOPTER COMPANY d/b/a MCDONNELL                            :
DOUGLAS HELICOPTER SYSTEMS; and                              :
THE BOEING COMPANY                                            :
c/o Corporation Service Company                              :
2338 W. Royal Palm Road, Suite J                             :
Phoenix, AZ  85012                                           :
                                                             :
              and                                            :

UNIVERSAL POWER, INC.                    :
c/o Russell L. Strohn, Jr.               :
P.O. Box 842459                          :
Hildale, UT  84784                       :
                                         :
            and                          :
                                         :
DOES ONE through ONE HUNDRED, inclusive, :
and each of them,                        :
                                         :
                    Defendants.          :


## CIVIL ACTION COMPLAINT

Marlette E. Thomas and Kathryn A. Thomas, Francis N. Kuhn and Mary Ann Kuhn, and Rory Laughman, by and through their attorney, Richard E. Genter, respectfully allege as follows:

## GENERAL ALLEGATIONS

### The Parties

1.      These actions on behalf of plaintiffs, Marlette E. Thomas and Kathryn A. Thomas, Individually and as Co-Executors of the Estate of James A. Thomas; Francis N. Kuhn and Mary Ann Kuhn, Individually and as Co-Executors of the Estate of Jody A. Laughman, and Rory Laughman, Individually and as Administrator of the Estate of Nicole L. Laughman, all deceased, on behalf of the Estates of James A. Thomas, Jody A. Laughman and Nicole L. Laughman, and all surviving next of kin of James A. Thomas, Jody A. Laughman and Nicole L. Laughman, seek damages recoverable under applicable wrongful death and survival action common law and/or statutes for the wrongful death of James A. Thomas, Jody A. Laughman and Nicole L. Laughman who died as a result of injuries suffered in a helicopter crash that occurred on June 15, 2003.

5

2.      Plaintiffs, Marlette E. Thomas and Kathryn A. Thomas, are individuals, husband and wife, citizens and residents of the Commonwealth of Pennsylvania, residing at 15021 Bonnair Road, Glen Rock, PA 17327, and at all times material hereto, are the surviving parents of their deceased adult son, James A. Thomas, and the duly appointed Co-Executors of the Estate of James A. Thomas, deceased, having been so appointed on June 27, 2003 by the Register of Wills of the County of Adams, Gettysburg, Pennsylvania. Plaintiffs bring this action in their capacity as Co-Executors, individually and in their own right, and on behalf of all interested beneficiaries and/or next of kin of the decedent.

3.      Plaintiffs, Francis N. Kuhn a/k/a Francis W. Kuhn and Mary Ann Kuhn, are individuals, husband and wife, citizens and residents of the Commonwealth of Pennsylvania, residing at 226 Princess Street, Hanover, PA 17331, and at all times material hereto, are the surviving parents of their deceased adult daughter, Jody A. Laughman, and the duly appointed Co-Executors of the Estate of Jody A. Laughman, deceased, having been so appointed on June 27, 2003 by the Register of Wills of the County of Adams, Gettysburg, Pennsylvania. Plaintiffs bring this action in their capacity as Co-Executors, individually and in their own right, and on behalf of all interested beneficiaries and/or next of kin of the decedent.

4.      Plaintiff, Rory L. Laughman, is an individual, citizen and resident of the Commonwealth of Pennsylvania, currently residing at 319 Eagle Avenue, Hanover, PA 17331, and at all times material hereto, is the surviving father of his deceased minor daughter, Nicole L. Laughman, deceased, and the duly appointed Administrator of the Estate of Nicole L. Laughman, deceased, having been so appointed on August 14, 2003 by the Register of Wills of the County of Adams, Gettysburg, Pennsylvania. Nicole L. Laughman, deceased, was the daughter born of the marriage of Rory L. Laughman and Jody A. Laughman,

deceased.  Plaintiff brings this action in his capacity as Administrator of the Estate of Nicole L. Laughman, individually and in his own right, and on behalf of all interested beneficiaries and/or next of kin of the decedent.

5.     Defendant, K&S Helicopters, Inc. is a corporation organized and existing under the laws of the State of Hawaii, with its principal place of business located in Kailua-Kona, HI, but, upon information and belief, conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over this defendant.  At all times material hereto, this defendant is in the business of owning and operating helicopters which are used, among other things, to provide commercial sightseeing tour rides in and around the Hawaiian Islands.

6.     Defendant, K&S Helicopters, Inc. d/b/a Tropical Helicopters is a corporation and/or business entity organized and existing under the laws of the State of Hawaii, with its principal place of business in Kailua-Kona, HI, but, upon information and belief, conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over this defendant.  At all times material hereto the name Tropical Helicopters is a trade name registered by and/or a separate entity created by defendant K&S Helicopters, Inc. for the purpose of providing commercial helicopter sightseeing tour rides in and around the Hawaiian Islands.

7.     Defendant, Calvin G. Dorn, is an individual, citizen and resident of the State of Hawaii, residing and/or conducting business at 73-4345 Paani Place, Kailua-Kona, HI, and at all times material hereto acted individually and/or in his capacity as president, shareholder, director, officer, agent and/or employee of defendant K&S Helicopters, Inc. and defendant K&S Helicopters, Inc. d/b/a Tropical Helicopters.  Defendants K&S Helicopters, Inc., K&S

Helicopters, Inc. d/b/a Tropical Helicopters and Calvin G. Dorn are hereinafter collectively referred to as "the K&S defendants".

8.     Defendant, Joseph Edward Zaremba, is an individual, citizen and resident of the State of Hawaii, residing and/or conducting business at 73-4344 Pahee Place, Kailua-Kona, HI, and at all times material hereto acted either individually and/or in his capacity as agent, servant, workman and/or employee of the K&S defendants, including but not limited to acting and serving as the Director of Maintenance for the commercial helicopter operations of the K&S defendants and/or acting and serving as the sole proprietor of a helicopter maintenance facility doing business as Pacific Turbine.

9.     Defendant, Pacific Turbine, Inc., is a corporation duly organized and existing under the laws of the State of Hawaii, with its principal place of business at 73-4344 Pahee Place, Kailua-Kona, HI, and at all times material hereto is and/or was in the business of providing aircraft and helicopter inspection, maintenance and repair, including providing personnel to act, serve and perform the maintenance operations and requirements of the K&S defendants.  Defendants Pacific Turbine, Inc., Joseph Edward Zaremba, and Joseph Edward Zaremba d/b/a Pacific Turbine are hereinafter collectively referred to as "the Zaremba defendants".

10.     Defendant, Tina Holliday, Special Administrator of the Estate of Russell Timothy Holliday, deceased, is an individual, citizen and resident of the State of Washington, and at all times material hereto is the surviving spouse and duly appointed Administrator of the Estate of Russell Timothy Holliday, deceased, having been so appointed on February 15, 2005 by Order of the Circuit Court of the Third District, State of Hawaii.  At all times material hereto, defendant's decedent, Russell Holliday, served as pilot-in-command of the

accident helicopter which crashed causing the death of plaintiffs' decedents, and in connection thereto, pilot Holliday acted either individually and/or in his capacity as agent, servant, workman and/or employee of the K&S defendants.  Defendant Tina Holliday, Special Administrator of the Estate of Russell Timothy Holliday is hereinafter referred to as defendant Holliday.

11.     Defendant, Activity Information Center, Inc., is a corporation duly organized and existing under the laws of the State of Hawaii, with its principal place of business in Honolulu, HI, but, upon information and belief, conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over this defendant.  At all times material hereto this defendant is in the business of selling and marketing activities and tour packages available in and around the Hawaiian Islands, including helicopter sightseeing rides.

12.     Defendant, Activity Information Center, Inc. d/b/a Hawaii Activity World, is a corporation and/or business entity organized and existing under the laws of the State of Hawaii with its principal place of business in Honolulu, HI, but, upon information and belief, does regularly conduct and/or transact business within the Commonwealth of Pennsylvania, sufficient to satisfy the exercise of jurisdiction over this defendant.  At all times material hereto the name Hawaii Activity World is a trade name registered by and/or a separate entity created by defendant Activity Information Center, Inc. for the purpose of providing activity sales and tour packages, including helicopter sightseeing rides, in and around the Hawaiian Islands.  Defendants Activity Information Center, Inc. d/b/a Hawaii Activity World and Activity Information Center, Inc., are hereinafter collectively referred to as "the Hawaii Activity World defendants".

13.     Defendants Extex, Extex, Ltd. and Extex Ltd. LLC are one or more corporations duly organized and existing under the laws of the State of Ohio, with their principal place of business located at 1383 N. Tech Blvd., Gilbert, AZ, but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over these defendants.  At all times material hereto, said defendants hold FAA Parts Manufacturer Approval (PMA) for an engine component part called the compressor adapter coupling, which component part failed on the accident helicopter engine resulting in an immediate and total loss of engine power and subsequent crash of the helicopter piloted by defendant Holliday.

14.     Defendant, Extex Investors, Ltd., is a corporation duly organized and existing under the laws of the State of Ohio, with its principal place of business located in Akron, Ohio.  At all times material hereto, this defendant is either the parent, holding company and/or legal beneficiary of the business operated and conducted by the defendants Extex, Extex Ltd. and Extex Ltd. LLC.

15.     Defendant, Larry Shiembob, is an individual, citizen and resident of the State of Arizona, residing and/or conducting business at 1383 N. Tech Blvd., Gilbert, AZ, and at all times material hereto acted individually and/or in his capacity as president, shareholder, director, officer, agent and/or employee of defendants Extex, Extex Ltd. and Extex Ltd. LLC and Extex Investors Ltd.  Defendants Extex Investors Ltd., Larry Shiembob and Extex, Extex Ltd., and Extex LLC are hereinafter collectively referred to as "the Extex defendants".

16.     Defendant, Superior Air Parts, Inc., (hereinafter referred to as defendant Superior) is a corporation duly organized and existing under the laws of the State of Texas, with its principal place of business located at 621 South Royal Lane, Suite 100, Coppell, TX,

but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over this defendant and further, this defendant has a registered agent for service of process in this District.   At all times material hereto, defendant Superior is the original PMA designer, developer and manufacturer of the make and model compressor adapter coupling which failed on the engine of the accident helicopter, having sold their PMA assets, rights and responsibilities to manufacture PMA parts for the Allison 250 series engines to the Extex defendants in and around 1996.

17.     Defendants, Rolls-Royce Corporation, Rolls-Royce Engine Company and Rolls-Royce Engine Services, are one or more corporations duly organized and existing under the laws of the State of Indiana, with their principal place of business located at 2001 S. Tibbs Avenue, Mail Drop u27, Indianapolis, IN, but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over these defendants.   At all times material hereto these defendants are the corporate successor(s) and/or successor(s) in interest to the Allison Engine Company, Inc. d/b/a Rolls Royce-Allison; Allison Engine Company; General Motors Corporation, Allison Gas Turbine Division; General Motors Corporation, Detroit Diesel Allison Division, and/or General Motors Corporation, the original and/or predecessor manufacturer(s) of the Allison 250 series engines, including the accident engine and the accident engine components.   Further, at all times material hereto, defendant Rolls-Royce Corporation holds the FAA Type Certificate and/or Production Certificate for the make and model of the Allison 250 series engine and engine components used in the accident engine and/or has otherwise acquired the design, development, servicing, customer support, repair,

publication and other manufacturing responsibilities for the Allison 250 series engine and engine components thereof, previously belonging to the original and/or predecessor manufacturers.

18.     Defendants, Allison Engine Company, Inc. d/b/a Rolls Royce-Allison; Allison Engine Company; General Motors Corporation, Allison Gas Turbine Division; General Motors Corporation, Detroit Diesel Allison Division, and General Motors Corporation, are corporations duly organized and existing under the laws of the State of Delaware, with their principal places of business in the State of Michigan, but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over these defendants.   At all times material hereto, these defendants were the original designer(s), developer(s) and manufacturer(s) of the Allison 250 series engine, including the accident engine and the engine components thereof. Upon information and belief, and as a result of various corporate mergers and acquisitions, the design, development, servicing, customer support, repair, publication and other manufacturing responsibilities of these defendants with regard to the Allison 250 series engine and engine components have been sold, assigned and/or otherwise transferred to or acquired by the defendant Rolls-Royce Corporation.   Accordingly, these defendants, together with the defendant Rolls-Royce Corporation, are hereinafter collectively referred to as "the Rolls-Royce/Allison defendants".

19.     Defendant, MD Helicopters, Inc., (hereinafter, "MDHI"), is a corporation duly organized and existing under the laws of the State of Arizona, with its principal place of business located at 4555 East McDowell Road, Mesa, AZ, but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania

sufficient to satisfy the exercise of jurisdiction over this defendant.  At all times material hereto, defendant MDHI is the corporate successor and/or successor in interest to MD Helicopters USA, Inc., Hughes Helicopter Company, McDonnell Douglas Corporation, McDonnell Douglas Helicopter Company (MDHC), McDonnell Douglas Helicopter Company d/b/a McDonnell Douglas Helicopter Systems (MDHS), The Boeing Company, and MD Helicopter Holdings, Inc., a subsidiary of RDM Holdings, Inc., the original and/or predecessor manufacturer(s) of the accident model helicopter, including the accident helicopter and its components.  Further, at all times material hereto, defendant MDHI holds the FAA Type Certificate and/or Production Certificate for the make and model of the MD500 series helicopter, including the accident helicopter and/or has otherwise acquired the design, development, servicing, customer support, repair, publication and other manufacturing responsibilities for the MD500 series helicopter, including the accident helicopter and its components previously belonging to the original and/or predecessor manufacturer(s).

20.    Defendant(s) MD Helicopters B.V. and RDM Holding(s) Inc. are foreign public companies organized and existing under laws of the Netherlands, having their principal place(s) of business in the Netherlands, and at all times material hereto are either the parent, holding company, majority shareholder and/or legal beneficiary of the business operated and conducted by defendant MDHI.

21.    Defendants, MD Helicopters USA, Inc., Hughes Helicopter Company, McDonnell Douglas Corporation, McDonnell Douglas Helicopter Company (MDHC), McDonnell Douglas Helicopter Company d/b/a McDonnell Douglas Helicopter Systems (MDHS), The Boeing Company, and MD Helicopter Holdings, Inc., a subsidiary of RDM Holdings, Inc., are corporations duly organized and existing under the laws of states other

than Pennsylvania, having their principal places of business in a state other than Pennsylvania, but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over these defendants.  At all times material hereto, these defendants are either the original and/or predecessor designers, developers, and manufacturers of the accident model helicopter, including the accident helicopter and the components thereof.  Upon information and belief, and a result of various corporate mergers and acquisitions, the design, development, servicing, customer support, repair, publication and other manufacturing responsibilities of these defendants, with regard to the accident model helicopter, including the accident helicopter and the components thereof, have been sold, assigned and/or otherwise transferred to and/or acquired by the defendants MDHI and/or MD Helicopters BV.   Accordingly, these defendants, together with the defendants MDHI and MD Helicopters BV, are hereinafter collectively referred to as "the MDHI defendants".

22.     Defendant, Universal Power, Inc., is a corporation duly organized and existing under the laws of the State of Utah, with its principal place of business located at 3945 West 7875 South, West Jordan, UT, but, upon information and belief, regularly conducts and/or transacts business within the Commonwealth of Pennsylvania sufficient to satisfy the exercise of jurisdiction over this defendant.  At all times material hereto, this defendant is and/or was a maintenance facility which performed, at the request of the K&S defendants and/or the Zaremba defendants, inspection, maintenance, and repair on the accident helicopter engine, including but not limited to the compressor assembly, the turbine assembly and/or the components thereof.

23.    Defendants, Doe, One through One Hundred, inclusive, are individuals, corporations, government entities and/or other entities or associations, the true name, identities, involvement and capacities of which are unknown to plaintiffs at this time, who are therefore sued as Doe defendants by their fictitious names, and plaintiffs will ask leave of Court to amend this Complaint to show their true names, identifies, involvement and capacities when the same has been ascertained.   Plaintiffs are informed and believe, and thereupon allege, that each of the defendants designated as a Doe defendant is or may be negligent and/or otherwise legally responsible in some manner for the events and happenings hereinafter described and which proximately caused the damages suffered by plaintiffs herein.

**Jurisdiction and Venue**

24.    Jurisdiction of the within Court is invoked pursuant to 28 U.S.C. § 1332 due to the diversity of citizenship between the parties and the amount in controversy being certified in excess of $100,000.000, exclusive of interest and costs.   Jurisdiction of the within Court is also invoked pursuant to 28 U.S.C. § 1331, Federal Question Jurisdiction, in that the accident occurred in Hawaii Volcanoes National Park and the cause of action arises under 16 U.S.C. § 457 of the National Parks Act.

25.    The Eastern District of Pennsylvania is an appropriate venue in which to pursue this action under 28 U.S.C. § 1391(b) in that it is a judicial district in which one or more of the defendants may be found.

**Background Facts Regarding The Accident Flight**

26.    On June 15, 2003, plaintiffs' decedents, James A. Thomas, age 38, Jody A. Laughman, age 36, and Nicole L. Laughman, age 13 were passengers on board a certain McDonnell Douglas 369D helicopter, FAA Registration Number N4493M (the "accident

helicopter") equipped with an Allison 250-C20B engine, which helicopter departed from Hilo International Airport at approximately 9:15 a.m. Hawaii standard time, on a for-hire sightseeing tour over portions of Hawaii, including Volcanoes National Park. The accident helicopter is also known as an MD500D.

27.     The sightseeing tour ride contracted for was known as the Hilo Volcano Helicopter Deluxe and was purchased by plaintiffs' decedents from the Hawaii Activity World defendants, with the tour ride to be given by the K&S defendants.

28.     The accident helicopter was owned and operated by the K&S defendants, and flown by their designated pilot, defendant Holliday.

29.     The accident helicopter departed on June 15, 2003 in visual meteorological conditions and under visual flight rules, and within 30 minutes after departure, defendant Holliday radioed a "Mayday" call to other aircraft as a result of an in-flight engine failure he was experiencing.

30.     Other aircraft in the area not only heard the "Mayday" call over common area traffic frequency, but could also hear the engine out audible alarm in the background coming from the accident helicopter.

31.     The K&S defendants are a for-hire commercial operation whose business activities are controlled and governed by, among other things, 14 C.F.R. Part 135 (hereinafter FAR Part 135) and Special Federal Aviation Regulation (SFAR) 71.

32.     In connection with their Part 135 Commercial operations, the K&S defendants are required by law to have a duly appointed Director of Maintenance and, upon information and belief, the Zaremba defendants acted and served as the designated Director of

Maintenance for the K&S defendants and, in fact, at all times material hereto carried out the duties of such.

33.     As a result of the in-flight engine failure, defendant Holliday was required to attempt to safely land the accident helicopter and/or attempt to locate a suitable landing site for a safe emergency landing, which efforts were unsuccessful as a consequence of the fact that defendant Holliday was operating the accident helicopter at the time the engine failed in, near and/or over the lava fields on the Pulama Pali in the Volcanoes National Park, Volcanoes, Hawaii, and in an area and at an altitude which was in violation of the FAA approved procedures manual for the K&S defendants, and/or was otherwise operating in violation of a temporary flight restriction zone established by the FAA at the request of the National Park Service on June 13, 2003, which restriction remained in effect on June 15, 2003.

34.     As a result of the in-flight engine failure and/or the failure and inadequate efforts of defendant Holliday to safely land the accident helicopter in an emergency, the accident helicopter crashed in and collided with the hardened lava field terrain, followed by an intense post-crash fire.

**Background Facts Regarding The Accident Engine And Its Components**

35.     The accident helicopter was equipped with a single Allison 250-C20B turboshaft engine, serial number CAE-835428 (hereinafter referred to as the "accident engine"). The accident engine is one of many models of the Allison Model 250-C20 Series of engines, which are currently designed, developed and manufactured by the Rolls-Royce/Allison defendants.

36.    The Allison Model 250-C20 series engine (hereinafter, "the accident model/series engine"), consists of four major engine components or assemblies; a compressor, a combustion section, a turbine, and a power and accessories gearbox.    These four components combined make up the engine assembly.    (A schematic of the accident model/series engine appears below).



Major Engine Components 250-C20B

© 1980 General Motors Corp.

18

37.     The compressor assembly consists of various components, including a compressor rotor assembly.  The compressor rotor assembly consists of six stages of wheel assemblies, an impeller assembly, a tie bolt and the compressor adapter coupling.  Air enters the engine through a compressor inlet and after being compressed, the compressed air is then discharged into ducts, which convey the compressed air back to the combustion section of the engine.  (A schematic of the compressor rotor assembly appears below).



**COMPRESSOR ROTOR ASSEMBLY**

1 – Compressor Adapter Coupling
4 – Compressor Rotor Tie Bolt
6 – Compressor Impeller Assembly
8 – Compressor Wheel Assembly (6th Stage)
10 – Compressor Wheel Assembly (5th Stage)
12 – Compressor Wheel Assembly (4th Stage)
14 – Compressor Wheel Assembly (2nd and 3rd Stage)
16 – Compressor Wheel Assembly (1st Stage)

38.     The combustion section consists of several components.  Air which enters the combustion section is mixed with fuel sprayed from fuel nozzles and combustion takes place. Combustion gases then move forward out of the combustion section to the turbine section of the engine.

39.     The turbine section consists of two main components; a gas producer (N1) turbine rotor, which drives the compressor and accessory gear train, and a power (N2) turbine rotor, which furnishes output power to the engine, and drives the main transmission.

40.     The main power and accessories drive gear trains are enclosed in a single gear case, which acts as the structural support of the engine, and to which the other engine components are attached.  The compressor is mounted on the front of the power and accessories gearbox; the turbine is mounted between the combustion section and the power and accessories gearbox, and the combustion section is mounted on the turbine at the aft end of the engine.

41.     The engine assembly itself is considered to be modular.  In other words, from the standpoint of repair and maintenance, the engine components described above can be separately removed from the engine assembly so that while maintenance is being performed on a particular engine component or assembly (or module), a loaner or replacement module can be installed.  This interchangeability allows the helicopter to remain in service and operational while repair or maintenance is performed on a particular engine module.

42.     The accident engine as a complete assembly was installed on the accident helicopter in or about July 1988, was overhauled in 1991 and, after being reinstalled post overhaul, the accident engine as an assembly remained on the accident helicopter from 1991 until the time of the crash in June, 2003.

43.     Although the accident engine assembly remained on the accident helicopter from 1991 until the time of the crash, there were assorted engine component or module removals (*i.e.,* compressor, turbine, etc.) for repair or maintenance (routine or otherwise), all of which was foreseeable and as intended by the designer(s), developer(s) and/or manufacturer(s) of the accident helicopter, the accident model/series engine, the accident engine and its components, and also by those who own, operate, inspect, maintain and repair these engines.

44.     The K&S defendants purchased the accident helicopter in or around August 1999.

45.     The compressor assembly installed on the accident engine at the time of the June 15, 2003 crash (hereinafter, "the accident compressor assembly"), was a module that was installed on the accident engine in September 2002.   However, the accident compressor assembly had been previously installed in December 2000 on another helicopter, an Agusta A109A, registration no. N293G, registered to and owned by Niihau Helicopters, Makaweli, Hawaii (hereinafter "the Niihau helicopter").

46.     Prior to its installation in the Niihau helicopter, the accident compressor assembly had repair and maintenance performed to it in June 2000, including the installation of a new compressor adapter coupling.  The new compressor adapter coupling installed in the accident compressor assembly in June 2000 was a PMA part manufactured, sold, supplied and furnished by the Extex defendants.

47.     On March 22, 2001, the Niihau Helicopter was damaged in a hard-landing accident.

48.     Upon information and belief, no repair or maintenance was performed on the accident compressor assembly after this hard landing accident until July 1, 2002, at which time the accident compressor assembly was removed for inspection from the Niihau helicopter by the K&S defendants and/or Zaremba defendants.

49.     On or about July 22, 2002, after inspection of  the accident compressor assembly, the K&S defendants and/or Zaremba defendants determined that part to be airworthy and suitable for return to service, and certified it as such.

50.     Thereafter, on or about September 7, 2002, the K&S defendants and/or the Zaremba defendants, as Director of Maintenance for the K&S defendants, and with the express knowledge, consent and permission of the K&S defendants, installed the accident compressor assembly on the accident engine of the accident helicopter.

51.     Upon information and belief, the accident compressor assembly had not been used at all (*i.e.,* saw no service, cycle or operational time) from July 1, 2002 (the date of its removal from the Niihau helicopter) until after its installation on September 7, 2002 on the accident helicopter owned and operated by the K&S defendants.

52.     The accident compressor assembly remained in the accident helicopter from September 7, 2002 until June 15, 2003.

**Background Facts As To The MDHI Defendants And The Rolls-Royce/Allison Defendants**

53.     Prior to and on June 15, 2003, the MDHI defendants designed, developed, manufactured, assembled, inspected, tested, distributed, sold, serviced, supported, maintained and repaired the accident helicopter, and wrote and/or approved instructions and warnings for the accident helicopter and its components parts, including its flight manual, maintenance

manual, maintenance instructions, service bulletins, inspection schedules, and service life schedules.

54.     Prior to and on June 15, 2003, the Rolls-Royce/Allison defendants designed, developed manufactured, assembled, inspected, tested, distributed, sold, serviced, supported, maintained and repaired the accident model/series engine and its component parts, including the accident engine and its component parts that were incorporated and installed into the accident helicopter, and wrote and/or approved instructions and warnings for the accident engine, including its operation manual, maintenance manual, maintenance instructions, service bulletins, inspection schedules and service life schedules.

55.     The accident helicopter was manufactured and first sold by the MDHI defendants prior to October 1983.  The accident engine assembly was manufactured and first sold by the Rolls Royce/Allison defendants in February 1984.  Based upon these date(s) of first sale, it is anticipated that these defendants may assert the eighteen (18) year Statue of Repose contained in the General Aviation Revitalization Act of 1994 (GARA) as a bar to some of plaintiffs' claims, hence these additional allegations which follow.

56.     Long prior to June 15, 2003, the MDHI defendants and the Rolls Royce/Allison defendants manufactured the accident helicopter and the accident engine and the component parts thereof.  The accident helicopter and the accident engine and its component parts were all certified to the Federal Aviation Administration (FAA) by the defendants, through their agents, servants, workmen, employees, vendors and/or suppliers, as airworthy at the time of manufacture, and following the date of manufacture until the date of the accident, certified as airworthy to the FAA by virtue of the defendants' failing to notify either the FAA, other agencies of government, repair and maintenance facilities, owners of

affected helicopters and/or engines, plaintiffs, plaintiffs' decedents and those in their position, that there were defects in the design and/or manufacture of the accident helicopter and/or the accident engine and its components, which were known to the defendants but with respect to which they declined to provide required information, and which information was vital in connection with the certification, airworthiness and/or continued airworthiness of the accident helicopter and/or accident engine.

57.     Upon information and belief, the accident helicopter, and in particular, the accident engine and component parts thereof, were defectively designed and/or manufactured, such defects consisting of defects which are or might not be detectable during normal and/or special inspection and maintenance procedures conducted by maintenance facilities and/or mechanics in the field.

58.     With respect to the type certificate and/or production certificate for, and/or obligations with respect to continuing airworthiness of, the accident helicopter and/or the accident engine or a component, system, subassembly or other part thereof, the defendants knowingly misrepresented to the FAA, or concealed or withheld from the FAA, required information that is and was material and relevant to the certification, performance, maintenance, operation, airworthiness and/or continued airworthiness of the accident helicopter and/or accident engine or a component, system, subassembly or other part thereof, and is directly and causally related to the harm which plaintiffs and plaintiffs' decedents suffered and is directly related to the cause of the accident on June 15, 2003.  Such failures, conduct, acts or omissions, constitute an exception to the eighteen (18) year Statute of Repose referred to in GARA.

59. Defendants' knowing misrepresentation and/or concealing and withholding of information, consisted of failing to notify the FAA and other regulatory authorities of the extent and seriousness of the accident helicopter and/or accident engine's defects which caused, in whole or in part, the crash of the accident helicopter, and also consisted of improper certification and continued certification of the accident helicopter and accident engine assembly and their component, system, subassemblies or other parts thereof.

60. Notwithstanding defendants' knowledge of the defects associated with the accident helicopter and/or the accident engine, defendants failed to notify and adequately warn owners, operators, repair shops and the regulatory authorities concerning these problems, all of which affected the airworthiness and continued airworthiness of the accident helicopter and the accident engine.

61. Specifically, with respect to the defects alleged by plaintiffs, the defendants have issued numerous service bulletins, service letters, maintenance instructions, repair instructions and other written materials, allegedly issued to cure specific problems with the Allison 250 series/model engine or the components or systems they addressed, but instead simply hid or masked, intentionally or otherwise, the serious design and/or manufacturing flaws and defects in the accident helicopter and accident engine model and similar models, and/or such written materials or publications improperly attempted to blame maintenance facilities or mechanics in the field for the problems with the product, when in actuality the problem was one of defective design and/or manufacture.

62. In the case at bar, post-crash inspection of the accident engine revealed that the compressor adapter coupling failed in flight, leading to the crash of the accident helicopter. The compressor adapter coupling is part of the shafting system between the gas producer

turbine and the compressor.  Long prior to June 15, 2003, these defendants knew that a failure of this part results in an immediate and total loss of engine power.

63.    Long prior to June 15, 2003, these defendants knew or should have known, based upon a service history which includes numerous failed and/or prematurely worn parts, including numerous problems relating to the compressor adapter coupling itself, as well as to the interference fit between the compressor adapter coupling and the impeller, that the original design and/or manufacture of the accident helicopter and/or accident engine and the components thereof was defective and unreasonably dangerous.

64.    Upon information and belief, the defendants were aware long prior to June 15, 2003 of numerous other reports of accidents, incidents, failures and/or service difficulties involving the accident model/series engine, compressor adapter couplings, the impeller and the component parts to which the compressor adapter coupling and impeller are mated and/or interfaced, yet failed to disclose, concealed and/or withheld this information and/or the significance of such information from the FAA despite its obligation to do so under 14 C.F.R. § 21.3, which requires type certificate and/or production certificate holders and manufacturers, such as the defendants, to report all defects that they have determined, through service experience or otherwise, resulted in and/or can result in helicopter and/or engine failure.

65.    Upon information and belief, there have been numerous other reported accidents or incidents involving the alleged defectively designed and/or manufactured accident helicopter, accident model/series engine and/or its components, and there have been numerous unreported failures, perhaps unbeknownst to the FAA and other regulatory agencies.

66.     Based upon the foregoing, it is believed that the defendants have further concealed or withheld from the FAA required information that is material and relevant to the performance, maintenance, airworthiness, and continued airworthiness of the accident helicopter and/or the accident engine and its component parts.

67.     In the alternative, plaintiffs allege that the accident helicopter and the accident engine may and did contain new, used, rebuilt or overhauled components, systems, subassemblies or other parts, replacement parts or added parts, which render the GARA Statute of Repose not applicable, including but not limited to, new parts installed pursuant to compliance with Rolls-Royce/Allison Commercial Engine Bulletin (CEB) 1325.

68.     Specifically, in December 1993, the Rolls-Royce/Allison defendants issued Commercial Engine Bulletin (CEB) 1325, which bulletin introduced the release of a new compressor adapter coupling designed to provide improved spline wear characteristics.  CEB 1325 also allowed a modification to repair compressor assemblies with worn or damaged splines or snap ring grooves, and provided for a modification to the compressor impeller.

69.     Compliance with CEB 1325 resulted in various components in the compressor assembly being replaced with totally new parts or otherwise being reworked and being assigned new part numbers, thus rendering the entire compressor assembly a new part.

70.     A review of maintenance records on the accident helicopter engine revealed that the accident compressor assembly underwent a CEB 1325 modification on or about June 8, 2000, at which time a new compressor adapter coupling, a reworked impeller, as well as other new parts were installed in accordance with CEB 1325, all of which constitute new parts which render the GARA Statute of Repose not applicable.

71.     In the alternative, plaintiffs further allege that the manuals and/or other written materials, including service manuals, service bulletins, service kits, service letters and service instructions issued by the defendants and applicable to the accident helicopter and/or the accident engine, are defective and negligent such that if followed they fail to discover, reveal, or disclose the alleged defects giving rise to plaintiffs' claims.

**Background Facts As To The PMA Process**

72.     PMA stands for Parts Manufacturer Approval.  PMA is an FAA regulation set forth in the Code of Federal Regulations Title 14 (14 CFR), part 21, subpart K, § 21.303 (hereinafter F.A.R. § 21.303), which permits an entity other than the original equipment manufacturer (OEM) of an aircraft or engine part to manufacture and sell replacement parts.

73.     PMA was originally conceived, in part, as a way of keeping out of production aircraft in service which were no longer being supported by the OEM.  In an effort to insure a steady supply of parts for these aircrafts, the FAA recognized a need to permit non-OEMs to manufacture replacement parts.

74.     F.A.R. § 21.303 requires, among other things, that the replacement parts either duplicate the design of the original part, a process known as "identicality"; or that the parts be shown to meet or exceed the airworthiness requirements of the original product design, a process known as the "test and computation" method of approval.

75.     Generally, replacements parts made by way of "identicality" occurs when a PMA manufacturer obtains proprietary design drawings from the OEM through a licensing arrangement between the OEM and the PMA manufacturer.

76.     However, most PMA parts, including the failed Extex compressor adapter coupling in this case, are made through the "test and computation" method, whereby the PMA

manufacturer duplicates the design of the part through reverse engineering.  In this process, the PMA manufacturer analyses the OEM's original part and after determining the dimensions, material, construction and fabrication processes, the PMA manufacturer asks the FAA to agree that the PMA manufactured replacement part so precisely duplicates the original OEM part that the FAA certify the PMA part as an approved replacement part.

77.    For the PMA manufacturer, a key feature of the "test and computation" method of approval is that since the part duplicates the OEM's part, the FAA does not require that the PMA manufacturer write its own maintenance procedures, but rather allows the PMA manufacturer to use the OEMs maintenance practices and procedures.  In other words, the PMA manufacturer is relieved of the responsibility (and the cost) of developing its own program to insure the continued airworthiness of its part, and customers using PMA parts are, for the most part, instructed to follow the OEMs maintenance manuals, procedures and practices.

78.    Historically, PMA parts makers occupied a small niche in the regulatory framework (and in turn provided little competitive threat to OEMs), however, this changed around 1990 after the FAA adopted a more standardized PMA approval process.

79.    Once the PMA regulatory framework became better defined, the number of PMA parts available in the marketplace increased significantly.  In addition, growth of the PMA parts industry was enhanced by the fact that OEMs were more anxious to sell and make money on their newly designed products, so much so that some OEMs were actually relieved that their aftermarket responsibilities for their older models and products were being assumed by PMA manufacturers.  The PMA industry experienced further growth because OEM prices

for replacement parts was exorbitant compared to those charged by the PMA manufacturer for the very same part.

80.     However, when the aviation industry became depressed and new sales fell sharply, certain OEMs came to regret the loss of revenue generated by the sale of replacement parts.  As a result, OEMs realized that they needed to generate money from the sale of aftermarket parts, a market share which they had previously not focused on.

81.     As a result of the explosive growth of the PMA industry and the OEMs' loss of market share for replacement parts, certain OEMs, including the Rolls-Royce/Allison defendants, have become aggressively protective of their replacement parts market share, and have embarked on a plan to eliminate the PMA market entirely.

82.     The Rolls-Royce/Allison defendants, along with other OEMs, have attempted to accomplish this plan by:  (1) lowering their prices to match PMA prices, but only on parts that are also produced by PMA manufacturers; (2) signing up operators for long term maintenance and parts contracts which preclude the use of PMA parts; (3) asking the FAA to restrict the ability of non-OEMs to make aftermarket products; (4) making it difficult for alternative supply sources to enter the marketplace; (5) voiding warranties for their engines if any PMA part is used at all within the engine; and (6) withholding or delaying product improvements.

83.     The acts or omissions of the Rolls-Royce/Allison defendants, along with other OEMs, are designed to protect their market share and monopoly on replacement parts, and are not related to product safety.

84.     The battleground between OEMs and PMAs as it relates to engine replacement parts is extremely intense, and two of the most aggressive combatants in the OEM/PMA market share war are the Rolls-Royce/Allison defendants and the Extex defendants.

85.     Upon information and belief, the Rolls-Royce/Allison defendants consider the Extex defendants to be their biggest competitor and a major threat to their aftermarket livelihood with regard to the approximately 16,000 Rolls-Royce/Allison Model 250 engines that are in service today.

86.     Upon information and belief, the Extex defendants have targeted the design of the Rolls-Royce/Allison Model 250 series engine and have obtained or are in the process of obtaining a PMA for virtually every replaceable part in that engine.

87.     Upon information and belief, the Rolls-Royce/Allison defendants and the Extex defendants have long known of the defects in the compressor adapter coupling for the accident model engine and the defects in the accident model compressor assembly yet, prior to the accident which took the life of plaintiffs' decedents, failed to correct or repair known defects in the accident engine as a consequence of their ongoing battle with each other regarding replacement parts for the Rolls-Royce/Allison Model 250 series engines.

**Background Facts As To The Extex Defendants**

88.     In or around 1993, defendant Superior, using their own design, manufacturing and testing protocols, obtained PMA approval via the "test and computation" method (or its then equivalent) to manufacture and sell compressor adapter couplings for installation and use in the Allison 250 series engines.

89.     In or around 1996, the Extex defendants acquired some of the defendant Superior's assets, including the PMA rights to manufacture and sell compressor adapter couplings for the Allison 250 series engines.

90.     Upon information and belief, the Extex defendants sold approximately 660 compressor adapter couplings between 1996 and 2002.

91.     By March 2001, and perhaps earlier, the Extex defendants knew or should have known that their compressor adapter couplings were defective and unreasonably dangerous in design and/or manufacture, including the knowledge that one of their failed compressor adapter couplings was determined to have been the cause of a helicopter accident in Rockport, Texas in December 2000.

92.     Subsequent to March 2001, the Extex defendants knew or should have known that there was a serious design and/or manufacturing defect in their compressor adapter couplings, including the knowledge that there was no correlation between the compressor adapter couplings' service life and failure rate.  In other words, some couplings showed signs of failure after only 200 hours of service while some parts showed no signs of failure even after 2000 hours of service.

93.     The Extex defendants' knowledge of the defects in the design and manufacture of their compressor adapter couplings became so widespread and pervasive that by July 2002, nearly one year *before* the crash of the accident helicopter on June 15, 2003, the Extex defendants stopped selling their compressor adapter couplings altogether.

94.     The compressor adapter couplings manufactured and sold by the Extex defendants are not ordinary or household goods or a common business appliance, which by their nature are mass-marketed or mass-produced products that could get swept away in the

currents of commerce or could otherwise become impossible to track or difficult to locate. Rather, the compressor adapter couplings manufactured by the Extex defendants are sold in a small and distinct market, are a unique and costly product for which there are business establishments that service helicopter engines that are convenient and logical points of contact for the Extex defendants, and in fact, the Extex defendants routinely maintain contact with these facilities and owners/operators of their products or products for which they hold PMA approval for the very purpose of keeping them current on all pertinent information regarding their products.  Moreover, the defects alleged herein are not open and obvious but instead are latent, internal defects known only to the Extex defendants.

95.     Despite the Extex defendants' actual knowledge that the compressor adapter couplings that they designed, manufactured and/or sold were defective and unreasonably dangerous, and despite the fact that the Extex defendants stopped manufacturing and selling new compressor adapter couplings as of July 2002, and despite the fact that the Extex defendants were, by virtue of the type of product involved, able without difficulty to track and/or locate the remaining compressor adapter couplings located in service in the field, the Extex defendants failed to recall, retrofit or even warn their customers and the public at large that those compressor adapter couplings remaining in service were defective and unreasonably dangerous, and could and would likely fail in flight without any correlation to time in service.

96.     Despite the Extex defendants knowledge as aforesaid, the Extex defendants willfully, wantonly, callously and with reckless disregard for the rights and safety of the public, instead of recalling, retrofitting and/or warning of the dangers associated with their product, engaged in a parts mortality analysis, concluding that it would be cheaper for them to

allow the remaining population of couplings to remain in service rather than to recall, retrofit or remove those parts from service, or otherwise warn those using these couplings that they were defective and unreasonably dangerous.

**The Post-Crash Investigation**

97.     Post-accident investigation by the National Transportation Safety Board and others has confirmed that the compressor adapter coupling on the accident helicopter failed in-flight.

98.     Shortly after the accident which took the lives of plaintiffs' decedents, the Extex defendants issued Customer Information Letter T-080 acknowledging that there had been numerous prior reports of compressor adapter couplings failing in service, some of which were manufactured by the Extex defendants.

99.     In Extex Customer Information Letter T-080, the Extex defendants also claimed that there had been no indications of discrepancies in dimensions, material or workmanship of the Extex parts, but rather, the compressor adapter couplings experienced fatigue failures caused by fretting of the part in service.  The Extex defendants further claimed that they did not understand the cause of the fretting but acknowledged that failure of this critical part will result in an immediate and total loss of engine power.

100.     Upon information and belief, the information set forth by the Extex defendants in Customer Information Letter T-080 contained false and fraudulent misrepresentation, all deliberately designed by the Extex defendants further to their plan and scheme to avoid retrofitting or recalling their defective product and further, as part of their plan and scheme to blame others for their own defective and unreasonably dangerous product.

101.    On or about March 24, 2004, the Federal Aviation Administration (FAA) issued Special Airworthiness Information Bulletins (SAIBs) NE-0456 and NE-0458 advising owners, operators and repair stations of the reported numerous failures of compressor adapter couplings manufactured by both the Rolls-Royce/Allison defendants and the Extex defendants.

102.    Subsequent to the issuance of the aforesaid SAIBs, the FAA ultimately issued Airworthiness Directive (AD) No. 2004-26-09.   Under the FAA's regulatory scheme, compliance with an AD is mandatory.   AD 2004-26-09 required owners or operators to remove from service at specific times or intervals compressor adapter couplings manufactured by the Rolls-Royce/Allison defendants, the Extex defendants and defendant Superior, and replace those defective and unreasonably dangerous couplings with a new and improved part now made only by the Rolls Royce/Allison defendants.

103.    The actions taken by the FAA were as a result of information, including prior failures and failure rates, which were long known to the Rolls-Royce/Allison defendants, the Extex defendants, the MDHI defendants and defendant Superior, including information known to these defendants long prior to the crash of June 15, 2003 which took the lives of plaintiffs' decedents.

104.    It was as a result of these defendants' failure to comply with 14 CFR § 21.3 and/or their other reporting obligations regarding continuing airworthiness and/or failures in service of their parts, that the FAA was not first made aware of the problem with compressor adapter couplings until July of 2003 and, more specifically, not until and as a result of the crash which took the lives of plaintiffs' decedents.

**General Damage Allegations**

105.  Upon information and belief, passengers James A. Thomas, Jody A. Laughman and Nicole L. Laughman, did not suffer physical injuries in the crash sufficient to cause their death and perished in the post-crash fire.

106.  As a result of the foregoing crash and subsequent post-crash fire, plaintiffs' decedents, James A. Thomas, Jody A. Laughman and Nicole L. Laughman, were caused to endure severe mental anguish and distress, fear of impending death, extreme and excruciating post-crash pain and suffering of a measurable duration, and suffer severe physical injuries and thermal burns, which ultimately led to their death, together with pre-impact pain and suffering, mental and emotional injuries and post-impact physical, mental and emotional injuries and pain and suffering that preceded their death.

107.  Each of the decedents, by and through their legal representatives, has, and therefore makes, claim against the defendants for their severe physical, mental and emotional injuries, pain and suffering, property damage, and other related claims, which occurred before the impact and crash which caused their death, as well as claims for those injuries which occurred after the impact and crash, which ultimately caused and led to their death.

108.  As a result of the foregoing crash and subsequent post-crash fire which took the lives of their decedents, the plaintiffs and all those beneficially interested in the claims for the wrongful death of the decedents, have suffered the loss of the decedents, their care, companionship, society, comfort, counsel, love, services, and support, as well as severe and devastating emotional distress as a result of their decedents' catastrophic and fatal injuries.

109.  As a result of the foregoing crash and subsequent post-crash fire, plaintiffs' decedents and their estates, the plaintiffs individually and all those beneficially interested in

the claims for the wrongful death of decedents, James A. Thomas, Jody A. Laughman and Nicole A. Laughman, have sustained damages and are entitled to recover all fair and just compensatory damages allowed under applicable wrongful death and survival action law, including damages for the value of the plaintiffs' decedents' life, loss of past and future earnings and earning capacity of the decedent, loss of enjoyment of life, loss of probable support, future contributions and pecuniary benefits, loss of services, loss of inheritance or prospective accumulations, mental anguish, emotional pain, distress and suffering, grief and sorrow, loss of society, companionship, comfort, protection, parental care, attention, advice, maintenance, counsel, physical, intellectual and moral training, guidance and education, as well as decedents' pain, suffering and disfigurement, and plaintiffs' decedents were caused to endure great physical and mental pain and suffering before their death; and decedents' survivors were caused to incur funeral and burial expenses and other damages and are thus entitled to recover fair and reasonable monetary compensation for those damages; the exact amount of said damages are unknown at this time and plaintiffs' will seek leave of court, if necessary, to amend this Complaint when the amount has been determined.

## COUNT I

## WRONGFUL DEATH AND SURVIVAL DAMAGES BASED ON NEGLIGENCE

### Plaintiffs v. The K&S Defendants and Defendant Holliday

110.    Plaintiffs incorporate by reference paragraphs 1 through 109 as though set forth at length.

111.    On June 15, 2003, plaintiffs' decedents, James A. Thomas, Jody A. Laughman and Nicole L. Laughman were passengers on board the accident helicopter, which was owned, operated, maintained and controlled by the K&S defendants and was being piloted by

defendant Holliday.   The accident helicopter departed from Hilo International Airport at approximately 9:15 a.m. Hawaii standard time on a for-hire sightseeing tour over portions of Hawaii, including Volcanoes National Park.

112.   On or prior to June 15, 2003, the K&S defendants, by themselves and/or through their officers, agents, employees, servants and/or representatives, undertook to select, hire, train, instruct, educate and/or teach defendant Holliday regarding, among other practices and procedures, pre-flight planning, in-flight planning, including adherence to SFAR 71 and the K&S procedures and operations manual, emergency procedures, helicopter performance, engine out procedures, and helicopter safety operations in connection with the K&S defendants' commercial helicopter operation.

113.   On or prior to June 15, 2003, defendant Holliday, acted either individually or was an employee, servant and/or agent of the K&S defendants, and at all times material hereto, was acting within the scope of his authority, employment and/or agency for the K&S defendants.

114.   On June 15, 2003, at approximately 9:43 a.m. Hawaii standard time, the accident helicopter suffered an in-flight engine failure and defendant Holliday could be heard by other aircraft in the area declaring a "Mayday".   Shortly thereafter the accident helicopter crashed into a hardened lava field in the Volcanoes National Park, Hawaii.

115.   As a result of the foregoing crash and subsequent post-crash fire, plaintiffs' decedents were caused to endure severe mental anguish and distress, fear of impending death, post-crash pain and suffering and ultimately suffered severe physical injuries which caused their death.

116.   The K&S defendants, by themselves and/or through their officers, agents, employees, servants or representatives, as a common carrier of passengers for hire, owed plaintiffs' decedents' the highest duty of care to ensure that the accident helicopter and its pilot were safe and not unreasonably dangerous, and to ensure that the accident helicopter was operated so as not to cause injury or death, and otherwise owed plaintiffs' decedents' a duty to use reasonable care in the ownership, use, operation, inspection, maintenance and repair of the accident helicopter.

117.   At all times material hereto, the duties of the K&S defendants with respect to providing safe carriage to plaintiffs' decedents and with resepct to performing adequate inspection, maintenance and repair on the accident helicopter were non-delegable duties under the FARs and/or other applicable law.

118.   The defendants were negligent, by act or omission, and breached their duty of care to plaintiffs' decedents in that they:

a.   Carelessly, negligently and recklessly operated the accident helicopter and the accident engine;

b.   Carelessly, negligently and recklessly inspected the accident helicopter and the accident engine;

c.   Carelessly, negligently and recklessly maintained the accident helicopter and the accident engine;

d.   Careless, negligently and recklessly operated the accident helicopter by allowing the accident helicopter to crash, by failing to avoid the crash and/or otherwise failing to safely land the accident helicopter in an emergency;

e.      Careless, negligently and recklessly created an unreasonably dangerous condition at the time of the crash with regard to the accident helicopter and the accident flight;

f.      Failed to operate the accident helicopter considerate of the conditions that then and there existed;

g.      Failed to operate the accident helicopter considerate of the mechanical deficiencies and conditions which then and there existed;

h.      Failed to warn the plaintiffs' decedents prior to flight that there were serious mechanical deficiencies in and/or inadequate maintenance performed on the accident helicopter and the accident engine that could result in a crash or unsafe condition;

i.      Failed to properly inspect and/or correct deficiencies in the accident helicopter and the accident engine;

j.      Failed to properly instruct and warn the passengers before the accident flight;

k.      Failed to comply with their duties and responsibilities under and in accordance with the Federal Aviation Regulations with respect to the ownership, use, operation, control, maintenance, inspection, repair, airworthiness and continuing airworthiness of the accident helicopter and the accident engine;

l.      Failed to select competent and adequate maintenance facilities and/or maitnenace personnel to inspect maintain and repair the accident helicopter and the accident engine;

m.      Carelessly, negligently and recklessly failed to investigate the experience, qualifications and safety record of the pilot assigned to the accident flight;

n.      Carelessly, negligently and recklessly selected an inadequately trained, inexperienced, ill-prepared and unsafe pilot to act as pilot-in-command of the accident helicopter and knowingly compromised the safe operation of the accident flight;

o.      Carelessly, negligently and recklessly failed to train defendant Holliday regarding proper pre-flight and in-flight planning and procedures, including responses to emergencies, emergency procedures, and engine out procedures and adherence to and compliance with applicable regulations;

p.      Carelessly, negligently and recklessly failed to impose safe operational limits for the accident helicopter and the accident flight;

q.      Carelessly, negligently and recklessly failed to provide the services necessary to promote safety and avoid a crash;

r.      Carelessly, negligently and recklessly failed to disclose that the K&S defendants had a prior accident history, including a prior crash related to poor maintenance practices and pilot error;

s.      Carelessly, negligently and recklessly failed to follow all applicable Federal Aviation Regulations and the parameters of its own procedures and operations manuals, including flying the accident helicopter into a temporary flight restriction zone on the day of the accident;

t.      Carelessly, negligently and recklessly failed to maintain directional control, and failed to see and avoid terrain obstacles in order to ensure a safe landing in an emergency;

u.      Carelessly, negligently and recklessly flew the accident helicopter into a hardened lava field;

v.    Carelessly, negligently and recklessly failed to properly and safely operate the accident helicopter with due care and caution;

w.    Carelessly, negligently and recklessly deviated from good, sound, reasonable and safe helicopter operating practices and was otherwise negligent and careless in the operation and control of the accident helicopter on the accident flight;

x.    Otherwise failed to pay proper attention to the operation of the accident helicopter during the accident flight so as to avoid a crash landing;

y.    Failed to properly and adequately make a safe emergency landing;

z.    Such other acts of negligence as will appear during the course of discovery to be liability-producing conduct on the part of these defendants.

119.   At all times material hereto, the accident helicopter was in the exclusive possession and control of the K&S defendants and defendant Holliday; these defendants had the exclusive knowledge of the control and management of the accident helicopter, and the crash of the accident helicopter is one that would not ordinarily have happened in the absence of negligence.  Accordingly, the doctrine of *res ipsa loquitur* applies to the facts of this case, warranting an inference of negligence on the part of these defendants.

120.   As a direct and proximate result of the breach of duties and responsibilities, negligence, carelessness and recklessness of the K&S defendants and defendant Holliday, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT II

**WRONGFUL DEATH AND SURVIVAL
DAMAGES BASED UPON MISREPRESENTATION**

**Plaintiffs v. The K&S Defendants and Defendant Holliday**

121.    Plaintiffs incorporate by reference paragraphs 1 through 120 as though set forth at length.

122.    On or prior to June 15, 2003, the K&S defendants represented to plaintiffs' decedents that they would provide a safe, experienced, qualified and well-trained pilot, including a pilot that would adhere to and comply with all regulations governing the accident flight as well as the K&S defendants' procedures and operations manual, and also that they would provide a safe helicopter to fly the plaintiffs' decedents on their sightseeing tour.

123.    On June 15, 2003, defendant Holliday represented to plaintiffs' decedents that he was a safe, experienced, qualified and well-trained pilot, that the accident helicopter was safe and properly maintained for the sightseeing tour, and that the flight would be conducted safely and in accordance with company policy and procedure and would be in compliance with all applicable regulations.

124.    At all times material hereto, defendant Holliday was not a safe pilot, nor was he sufficiently experienced, qualified or trained to safely fly the accident helicopter, none of which information was communicated to plaintiffs' decedents.

125.    At all times material hereto, the accident helicopter was inadequately and improperly maintained and was otherwise unsafe to perform the accident flight and, in particular, the accident helicopter had critical engine components installed within the engine which were taken from a previously crashed helicopter, some of which were either improperly repaired and/or not repaired at all, none of which information was communicated to plaintiffs' decedents.

126.    At all times material hereto, the defendants knew or should of known that the accident helicopter was not capable of completing the mission safely and compromised the safe operation of the flight.

127.    At all times material hereto, the defendants represented to plaintiffs' decedents that the accident helicopter would fly in, over, above and around safe and permissible air space, all within the parameters of the Federal Aviation Regulations and in compliance with the defendants' procedures and operations manual.

128.    At all times material hereto, the defendants represented that they were a safe tour operator with an unblemished safety record, when in fact they were not, and in fact had a prior accident history, including a prior crash related to poor maintenance and pilot error, none of which was disclosed to and/or was deliberately concealed from plaintiffs' decedents.

129.    At all times material hereto, the defendants deliberately, intentionally and willfully operated the accident flight in and over air space which was part of a temporary flight restriction zone and otherwise operated the aircraft at unsafe altitudes in violation of the Federal Aviation Regulations, SFAR 71 and the K&S defendants' own procedures and operations manual, none of which information was communicated to plaintiffs' decedents, either before or during the accident flight.

130.    Plaintiffs' decedents were unaware that the representations made by the defendants regarding the safety of the accident helicopter, the safety and training of the accident pilot, and the safety of the route of the flight in question were false, and had plaintiffs' decedents been provided accurate information regarding the capabilities of the accident helicopter, the accident engine, the accident pilot, and information regarding the route of flight of the accident helicopter, plaintiffs' decedents would not have taken the accident flight.

131.    The crash, injuries, death and resultant damages were caused by the defendants as a result of their intentional, reckless and/or negligent misrepresentations.

132.    As a direct and proximate result of the misrepresentations, gross negligence, carelessness and recklessness of the K&S defendants and defendant Holliday, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT III

## WRONGFUL DEATH AND SURVIVAL DAMAGES BASED ON NEGLIGENCE

### Plaintiffs v. The K&S Defendants and The Zaremba Defendants

133.    Plaintiffs incorporate by reference paragraphs 1 through 132 as though set forth at length.

134.    On or prior to June 15, 2003, the K&S defendants and the Zaremba defendants, by themselves, and/or through their officers, agents, employees, servants and/or representatives, were responsible for and otherwise undertook to perform inspection, maintenance, and repair on the accident helicopter, the accident engine and/or their component parts.

135.    On or prior to June 15, 2003, the K&S defendants and the Zaremba defendants, owed a duty of care to plaintiffs' decedents to use reasonable care in the use, ownership, operation, inspection, maintenance and repair of the accident helicopter, the accident engine and/or their components parts.

136.    On or prior to June 15, 2003, the Zaremba defendants, with respect to the inspection, maintenance, and repair that they performed on the accident helicopter, the accident engine and/or their component parts, acted, in whole or in part, either in their capacity as Director of Maintenance for the K&S defendants' Part 135 commercial operations, individually and/or as an employee, servant, and/or agent, and/or joint enterpriser with, the K&S defendants and at all times material hereto, were acting within the scope of their authority, consent and permission, express or implied, and/or within the scope of their employment, agency and/or joint enterprise with the K&S defendants.

137.    At all times material hereto, the K&S defendants and the Zaremba defendants, acting through their agents, servants, workman, and/or employees, negligently and improperly performed inspection, maintenance, and/or repair on the accident helicopter, the accident engine and their component parts.

138.    The defendants were negligent, by act or omission, and breached their duty of care in that they:

a.      Carelessly, negligently and recklessly maintained the accident helicopter, the accident engine and/or their component parts;

b.      Carelessly, negligently and recklessly inspected the accident helicopter, the accident engine and/or their component parts;

c.      Carelessly, negligently and recklessly repaired the accident helicopter, the accident engine and/or their component parts;

d.      Carelessly, negligently and recklessly installed, reinstalled and/or reassembled the accident engine and/or its component parts;

e.      Carelessly, negligently and recklessly selected unqualified and inadequate outside vendors to perform inspection, maintenance and repair on the accident helicopter, accident engine and/or their components parts;

f.      Carelessly, negligently and recklessly installed engine components from a previously crashed engine without first ascertaining the full extent of damage to that engine and/or its component parts, and/or without first performing proper and adequate inspection, maintenance and repair on the crashed engine parts;

g.      Careless, negligently and recklessly engaging in a practice of swapping out engine components or modules in a dangerous and haphazard fashion for the purposes of keeping their helicopters in flight, without regard to safety;

h.      Carelessly, negligently and recklessly altering engine component data plates for the purposes of keeping their helicopters in flight without regard to safety;

i.      Knowingly operating the accident engine with an altered engine component data plate, a reckless and dangerous practice, for the purposes of keeping their helicopters in flight, without regard to safety;

j.      Carelessly, negligently, recklessly and knowingly employing unqualified and inadequate outside vendors to perform inspection, maintenance and repair without regard to safety, simply because these defendants had an ownership and/or financial interest in those outside vendors;

k.      Carelessly, negligently, and recklessly failing to ascertain whether or not the outside vendors employed to perform inspection, maintenance and repair had the necessary qualifications, experience, skills, tools, facilities and equipment to perform the inspection, maintenance and repair requested;

l.      Carelessly, negligently, and recklessly keeping poor and inadequate records and paperwork with respect to the accident helicopter, the accident engine and/or their component parts in furtherance of their desire to keep their helicopters in flight, without regard to safety;

m.      Failed to properly and adequately perform and comply with applicable FAA airworthiness directives;

n.      Failed to properly and adequately perform and comply with manufacturer service bulletins, service letters, approved instructions, warnings, maintenance manuals, inspection schedules and service life schedules;

o.      Failed to properly and adequately perform inspection and testing on the accident helicopter, the accident engine and/or their component parts;

p.      Failed to properly and adequately perform inspection and testing on the accident helicopter, the accident engine and/or their component parts;

q.      Failed to properly and adequately use and comply with the accepted practices, procedures, techniques and materials when inspecting, maintaining, repairing, reassembling and reinstalling the accident engine and/or their component parts;

r.      Failed to warn users of the accident helicopter of the improper inspection, repair and maintenance performed on the accident engine;

s.      Unreasonably, improperly and contrary to regulations certifying the accident engine as airworthy;

t.      Failed to discover, or if discovered, failed to disclose and/or correct defective and dangerous conditions in the accident helicopter, the accident engine and/or their component parts;

u.      Failed to adhere to the Federal Aviation Regulations pertaining to inspection, maintenance, and repair;

v.      Carelessly, negligently and recklessly, either on their own, or in conjunction with other maintenance facilities, failed to properly and adequately maintain, inspect, repair, service or test the accident helicopter, the accident engine and/or their component parts;

w.      Provided defective and unsafe component parts or improperly installed and/or designed component parts into the accident engine;

x.      Otherwise being negligent under the circumstances;

y.      Such other acts of negligence as will appear during the course of discovery to be liability producing conduct on the part of these defendants.

139.    As a direct and proximate result of the breaches of duties and responsibilities, negligence, carelessness and recklessness of the K&S defendants and the Zaremba defendants, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in the injuries to and the death of the plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT IV

### WRONGFUL DEATH AND SURVIVAL
### DAMAGES BASED ON BREACH OF WARRANTY

### Plaintiffs v. The K&S Defendants and The Zaremba Defendants

140.    Plaintiffs incorporate by reference paragraphs 1 through 139 as though set forth at length.

141.    The defendants are liable to plaintiffs and plaintiffs' decedents on the basis of breach of warranty in that, at all times material hereto, the accident helicopter, the accident

engine and/or their component parts were inspected, maintained and repaired with express warranties and/or implied warranties that the accident helicopter and accident engine were of fair and average qualities in the trade, were safe and merchantable, and were fit for their ordinary and particular purpose.

142.    The defendants also warranted that the accident helicopter and accident engine were free of defects in materials and/or workmanship when in fact they were dangerous and defective in breach of the aforesaid warranties.

143.    When the defendants inspected, maintained and repaired the accident helicopter, accident engine and their component parts they expressly warranted that the accident helicopter and accident engine were in a condition suitable for safe flight when in fact they were not in a condition suitable for safe flight, thus said express warranty was breached and, as a proximate result of said breach, plaintiffs suffered injuries resulting in their death.

144.    As a result of the inspection, maintenance and repair of the accident helicopter, accident engine and/or their component parts by the defendants, there also arose certain warranties implied by law.  Those warranties include merchantability and fitness for a particular purpose, to wit, safe flight.

145.    Plaintiffs' decedents relied upon such warranties in occupying the accident helicopter on June 15, 2003.

146.    The defendants did breach their implied warranties of merchantability in that:

        a.      Defendants, merchants in the goods of the type used by plaintiffs' decedents, did not have the same adequately inspected, maintained and repaired;

b.      Said goods were not of fair and average quality in the trade in which the defendants engage;

c.      Said goods were not fit for the ordinary purpose for which said goods were used;

d.      Said goods were not in conformity with, in so far as safety was concerned, those generally used in the trade or business in which the defendants are engaged;

e.      The defendants knew or should have known that the goods were not fit for their ordinary purposes;

f.      Defendants knew or should have known that said goods were defectively, negligently and improperly inspected, maintained and/or repaired and as such were dangerous to the plaintiffs' decedents and others in their position;

g.      The defendants knew or should have known that said goods were inadequate for the purposes intended and were dangerous to the safety of plaintiffs' decedents and others in their position;

h.      Said goods did not conform to the normal commercial standards of the trade in which the defendants engage.

147.   The defendants did breach their implied warranties of fitness for a particular purpose in that:

a.      The defendants knew or should have known that said goods would be used by plaintiffs' decedents and others in their position;

b.      The defendants knew or should have know that plaintiffs' decedents and others in their position did and would rely upon the defendants to furnish goods which were not defective;

c.     The defendants knew or should have known that the goods were not adequately and properly inspected, maintained and repaired and therefore would not be fit for the purposes for which plaintiffs' decedents and others in their position would be using them;

d.     The defendants failed to provide a safe and non-defective accident helicopter, accident engine and components thereof, which would not cause injury, harm and damage to plaintiffs' decedents and others in their position.

148.    As a direct and proximate result of the breaches of warranty by the K&S defendants and the Zaremba defendants, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in injuries to and the death of the plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT V

## PUNITIVE DAMAGES

### Plaintiffs v. The K&S Defendants, The Zaremba Defendants And Defendant Holliday

149.    Plaintiffs incorporate by reference paragraphs 1 through 148 as though set forth at length.

150.    The defendants' acts and omissions, in knowingly using an unsafe and improperly maintained helicopter, in knowingly using engine parts in the accident engine

which were from a previously crashed engine without properly and thoroughly inspecting the crashed engine and its component parts prior to reusing them, by intentionally flying and operating the accident helicopter into an area which was subject to a temporary flight restriction, and by intentionally operating the accident helicopter at an unsafe location and altitude thereby allowing it to crash into a hardened lava field in violation of Federal Aviation Regulations, SFAR 71 and the requirements of the defendants own procedures and operations manual, notwithstanding the known dangers and hazards in doing so, all constitute willful, wanton, reckless and malicious misconduct and gross negligence, evidencing a conscious indifference and reckless disregard for the safety of plaintiffs' decedents.

151.    As a result of defendants' willful, wanton, malicious misconduct, and conscious indifference and reckless disregard for the safety of plaintiffs' decedents, plaintiffs, their decedents, their decedents' estates and surviving next of kin are entitled to punitive damages as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for punitive damages in an amount to be determined at trial, and for such other and further relief as the court deems just.

## COUNT VI

### WRONGFUL DEATH AND SURVIVAL
### DAMAGES BASED ON BREACH OF CONTRACT

### Plaintiffs v. The K&S Defendants and The Hawaii Activity World Defendants

152.    Plaintiffs incorporate by reference paragraphs 1 through 151 as though set forth at length.

153.    On or prior to June 15, 2003, plaintiffs' decedents contracted with the defendants for a commercial sightseeing tour ride over portions of the Big Island of Hawaii,

including Volcanoes National Park, for which plaintiffs' decedents paid the defendants the required consideration.

154.    Defendants, in arranging and providing the aforementioned tour ride, acted in the capacity of a common carrier and assumed the duties of a common carrier towards the plaintiffs' decedents, including the duty of providing a safe tour ride.

155.    Defendants breached their duties to plaintiffs by placing them in the accident helicopter, which was unsafe and dangerous, and by otherwise exposing them to a hazardous and dangerous flight as previously described, which breach caused plaintiffs' decedents' injuries and led to their death.

156.    It was foreseeable that the acts or omissions of the defendants would create an unreasonable risk of harm or injury to plaintiffs' decedents.

157.    The acts or omissions of the defendants, jointly and severally, and as agents for and/or joint enterprisers with each other, constituted a breach of contract with plaintiffs' decedents, and such breach was the proximate and legal cause of the injuries and damages set forth herein.

158.    As a direct and proximate result of the breach of contract by the K&S defendants and the Hawaii Activity World defendants, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in injuries to and the death of the plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT VII

## WRONGFUL DEATH AND SURVIVAL DAMAGES BASED ON NEGLIGENCE

### Plaintiffs v. The Hawaii Activity World Defendants

159.   Plaintiffs incorporate by reference paragraphs 1 through 158 as though set forth at length.

160.   Prior to June 15, 2003, plaintiffs' decedents contacted the defendants for the purposes of arranging and selecting a helicopter sightseeing tour ride over portions of the Big Island of Hawaii.

161.   As a result of their discussions with plaintiffs' decedents regarding the nature of the flight desired, the defendants, by and through their agents, servants, workmen and/or employees, selected the K&S defendants to provide plaintiffs with their sightseeing tour ride.

162.   Upon information and belief, the defendants selected the K&S defendants over numerous other tour operators who were ready, willing, able and available to provide the same sightseeing tour ride in a safe manner.

163.   Defendants owed a duty of care to plaintiffs' decedents to select a safe sightseeing tour ride operator, including but not limited to an operator with an unblemished accident or incident record which would be detrimental to safe flight.

164.   The K&S defendants were not such a safe operator.  On the contrary, on September 29, 2001, a Bell 206 single-engine helicopter, powered by an Allison 250-C20B

56

engine, owned and operated by the K&S defendants and providing a sightseeing tour ride, crashed within minutes of departure and was destroyed in the collision sequence and post-crash fire.

165.    The cause of the September 29, 2001 accident was engine failure resulting from negligently and inadequately performed maintenance by the K&S defendants and mechanics on their behalf, including the Zaremba defendants, combined with pilot error on behalf of the K&S defendants once the engine failure occurred.

166.    The Hawaii Activity World defendants knew or should have known of the above-referenced accident involving the K&S defendants by virtue of the publicity and notoriety surrounding that accident.

167.    The defendants were negligent, by act or omission, and breached their duty of care to plaintiffs' decedents in that they:

   a. Carelessly, negligently and recklessly selected a sightseeing tour ride owner and operator, which was unsafe;

   b. Carelessly, negligently and recklessly selected a sightseeing tour operator who was inadequate for the flight intended;

   c. Carelessly, negligently and recklessly selected a sightseeing tour operator with an accident history;

   d. Failed to warn or otherwise inform plaintiffs' decedents prior to the flight that the K&S defendants were unsafe and had a history of an accident caused by poor maintenance and poor piloting;

   e. Carelessly, negligently and recklessly failed to investigate the experience, qualifications and safety record of the tour operator chosen to provide the sightseeing flight to plaintiffs' decedents;

   f. Failed to select another tour operator to provide the flight in question;

   g. Such other acts of negligence as will appear during the course of discovery to be liability producing conduct on the part of these defendants.

   168. As a direct and proximate result of the breach of duties and responsibilities, negligence, carelessness and recklessness of the Hawaii Activity World defendants, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

   WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

<u>**COUNT VIII**</u>

**WRONGFUL DEATH AND SURVIVAL**
<u>**DAMAGES BASED ON STRICT LIABILITY**</u>

**Plaintiffs v. The Extex Defendants, The Rolls Royce/Allison**
<u>**Defendants, The MDHI Defendants and Defendant Superior Air Parts**</u>

   169. Plaintiffs incorporate by reference paragraphs 1 through 168 as though set forth at length.

170.    At all times material hereto, the defendants were in the business of designing, developing, manufacturing, testing, servicing, distributing, assembling, supplying and selling helicopters, helicopter engines and/or helicopter engine components, and providing accompanying product support, product support materials, and continuing airworthiness materials with respect thereto, including service bulletins, service letters, service instructions and service manuals, and did in fact design, develop, manufacture and/or sell the accident helicopter, the accident engine and/or their component parts.

171.    Prior to and on June 15, 2003, the accident helicopter and its component parts were being operated and used for the purpose and in the manner for which they were designed, developed, manufactured, assembled, tested, serviced, distributed and sold and intended to be used, all in a manner foreseeable to the defendants.

172.    Prior to and on June 15, 2003, the accident engine and its component parts were being operated and used for the purpose and in the manner for which they were designed, developed, manufactured, assembled, tested, serviced, distributed and sold and intended to be used, all in a manner foreseeable to the defendants.

173.    At all times material hereto, the accident helicopter, the accident engine and/or their component parts were defective in design and/or manufacture, were defective for lack of warnings and instructions, and were in an unreasonably dangerous and unsafe condition, which was a substantial factor in the happening of this accident.

174.    The defects in the accident helicopter, the accident engine and/or their component parts consisted of, but are not limited to, the following:

a.    Defective design and development of the accident helicopter, the accident engine and/or their component parts;

b.      Defective manufacture of the accident helicopter, the accident engine and/or their component parts;

c.      Defective and inadequate written instructions, warnings, procedures and other product support information concerning the design, manufacture, inspection, maintenance and/or repair of the accident helicopter, the accident engine and/or their component parts;

d.      Failing to warn of the defects in the design, development and/or manufacture of the accident helicopter, the accident engine and/or their component parts;

e.      Failing to warn of the lack of airworthiness and continued airworthiness of the accident helicopter, the accident engine and/or their component parts;

f.      Designing, manufacturing and selling the accident helicopter, the accident engine and/or their component parts without performing proper testing during certification and/or manufacture or any time thereafter;

g.      Defective design, manufacture, assembly and selection of materials for the accident helicopter, the accident engine and/or their component parts;

h.      Certifying the accident helicopter, the accident engine and/or their component parts without proper testing, both pre- and post manufacture;

i.      Defective and inadequate warnings concerning prior failures and/or prior service history of the accident helicopter, the accident engine and/or their component parts;

j.      Designing and manufacturing the accident helicopter, the accident engine and/or their component parts with defective and inadequate parts and materials;

k.      Designing and manufacturing the accident helicopter, the accident engine and/or their component parts with defective parts and components, including the manner in which certain engine component parts interface and/or fit with other component parts;

l.      Designing and manufacturing the accident helicopter, the engine and/or their component parts with the materials that were defective and inadequate in strength, quality and/or performance;

m.      Designing, manufacturing, selling and/or supplying a defective helicopter engine and/or component parts thereof;

n.      Failing to correct known defects in, and/or failing to recall, replace and/or retrofit the accident helicopter, the accident engine and/or their component parts;

o.      Designing, manufacturing, selling and distributing a helicopter and components thereof which was not crashworthy;

p.      Designing, manufacturing, selling and distributing a heliopter which, in an otherwise survival crash scenario, burst into flames during the post-crash landing, killing the occupants thereof;

q.      Such other defects as will appear during the course of discovery to be liability-producing conduct on the part of these defendants.

175.    At all times material hereto, the accident helicopter, accident engine and the components thereof were in essentially the same condition before the crash as when they left the defendants' control, and were used in the foreseeable manner and for the particular purpose which the defendants' knew or should have known that their products would be used.

176.    At all times material hereto, and at all times prior to the subject accident, the defendants had the responsibility under the Federal Aviation Regulations as the owner(s) and/or holder(s) of the type and/or production certificate, and/or as the PMA holder for certain component parts to make certain that any defects in the accident helicopter, the accident engine and/or their component parts as designed, developed and/or manufactured or which defects were discovered through field and service experience, were corrected prior to causing serious injury or death, so long as the type or production certificate or PMA approval was not surrendered.

177.    At all times material hereto, and at all times prior to the subject accident, the defendants were aware of numerous prior events of engine failure and/or component part or engine module failure due to the defective design, development, manufacture, assembly and selection of materials, and the defects in product support materials, including instructions or warnings related to inspection, maintenance and repair with regard to the accident helicopter, the accident model/series engine, as well as the accident engine and/or their component parts, and had or should have had the means to correct the same, especially since the defendants knew that the failures as alleged herein continued to occur.

178.    The accident helicopter, the accident engine and/or their component parts are not ordinary or household goods or a common business appliance, which by their nature are mass marketed or mass produced products that could get swept away in the currents of commerce or otherwise become impossible to track or difficult to locate.  Rather, the accident helicopter, the accident engine and/or their components parts are sold in a small and distinct market, are a unique and costly product for which there are business establishments that service said helicopter engines and/or component parts that are convenient and logical points

of contact for the defendants, and in fact the defendants routinely maintain contact with these facilities and owners/operators of their products or products for which they hold the type or production certificate or PMA approval, for the very purpose of keeping them current and informed as to all pertinent information regarding their products.   Moreover, the defects alleged herein are not open and obvious, but instead are latent internal defects known only to the defendants.

179.   As a direct and proximate result of the defects and unreasonably dangerous conditions alleged herein, and the failure to warn of and/or correct these defects, and/or to otherwise retrofit or recall the accident helicopter, the accident engine and/or their component parts by the Extex defendants, the Rolls-Royce/Allison defendants, the MDHI defendants and defendant Superior, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in serious injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT IX

## WRONGFUL DEATH AND SURVIVAL DAMAGES BASED ON NEGLIGENCE

### Plaintiffs v. The Extex Defendants, The Rolls-Royce/Allison Defendants, The MDHI Defendants and Defendant Superior Air Parts

180.   Plaintiffs incorporate by reference paragraphs 1 through 179 as though set forth at length.

181.   The defendants owed a duty of care to plaintiffs' decedents to use reasonable care in connection with the design, development, testing, inspecting, manufacture, selection of materials for, assembly, distribution, sale, servicing, maintenance, airworthiness and continuing airworthiness of the accident helicopter, the accident engine and/or their component parts.

182.   Long prior to June 15, 2003, it became apparent through the high number of service difficulty reports, failures in the field and otherwise, that the accident helicopter, the accident engine and/or their component parts were unsuitable for its application and were defectively and/or negligently designed and/or manufactured, and were otherwise unsafe.

183.   Notwithstanding this actual knowledge, the defendants negligently, carelessly and recklessly failed to timely apprise owners and operators, the Federal Aviation Administration and others of the defects in and the unsuitability of the accident helicopter, the accident engine and/or their component parts.

184.   The defendants were negligent, by act or omission, and breached their duty of care owed to plaintiffs' decedents by:

a.   Failing to reasonably and properly design and develop the accident helicopter, the accident engine and/or their component parts in a manner suitable for its intended application;

b.      Failing to reasonably and properly manufacture, test, inspect, assemble and sell the accident helicopter, the accident engine and/or their component parts in a manner suitable for its intended application;

c.      Failing to reasonably and properly select materials which were adequate in strength, quality and/or performance for the accident helicopter, the accident engine and/or their component parts;

d.      Failing to reasonably and timely notify and warn the FAA and other regulatory authorities that defects in the accident helicopter, the accident engine and/or their component parts existed and/or had not been cured;

e.      Failing to warn and notify the public at large, including owners and operators and service facilities, that the defects and dangerous conditions in the accident helicopter, the accident engine and/or their components parts existed and/or had not been cured;

f.      Failing to correct known defects in materials utilized in the accident helicopter, the accident engine and/or their component parts;

g.      Failing to comply with their responsibilities as type and/or production certificate holder and/or PMA holder pertaining to design, manufacture, testing, identifying, correcting and warning of defects in the accident helicopter, the accident engine and/or their component parts;

h.      Failing to comply with their responsibilities as type and/or production certificate holder and/or PMA holder pertaining to airworthiness and continued airworthiness of the accident helicopter, the accident engine and/or their component parts;

i.      Failing to reasonably and properly instruct, warn and otherwise provide information regarding the unsuitability of the accident helicopter, the accident engine and/or their component parts for its intended application;

j.      Failing to reasonably and properly test and analyze the accident helicopter, the accident engine and/or their component parts for its intended application prior to or even after certification to ascertain the true nature of the defects and dangerous conditions in the accident helicopter, the accident engine and/or their component parts;

k.      Failing to warn that the accident helicopter, the accident engine and/or their component parts were inadequate for its intended use;

l.      Unreasonably, improperly and contrary to regulation, certifying to the FAA and/or other appropriate regulatory authorities that the accident helicopter, the accident engine and/or their component parts were airworthy and suitable for its intended application when in fact they were not;

m.      Designing and manufacturing the accident helicopter, the accident engine and/or their component parts with inadequate materials in strength, quality and performance;

n.      Failing to recall and/or retrofit the accident helicopter, the accident engine and/or their component parts;

o.      Carelessly, negligently and recklessly manufacturing, designing, developing, assembling, inspecting, testing, distributing, selling, and providing product support, product support materials, written instructions and written procedures related to inspecting, servicing, maintaining and repairing the accident helicopter, the accident engine and/or their component parts;

p.      Issuing written service instructions for maintenance and repair which were confusing and misleading and not capable of effectuating suitable repair to the accident helicopter, the accident engine and/or their component parts;

q.      Designing, manufacturing, selling and distributing a helicopter which contained defectively designed and/or manufactured engine parts;

r.      Designing, manufacturing, selling and distributing a helicopter which was not crashworthy;

s.      Failing to reasonably and properly design, develop, and manufacture a helicopter which would not burst into flames upon crash landings and/or impacts such as the crash in this case;

t.      Supplying and providing written maintenance instructions which were either too difficult, too confusing or otherwise were incapable of being complied with by mechanics in the field;

u.      Otherwise being negligent under the circumstances; and

v.      Such other acts of negligence as will appear during the course of discovery to be liability-producing conduct on the part of these defendants.

185.    As a direct and proximate result of the breach of duties and responsibilities, negligence, carelessness and recklessness of the Extex defendants, the Rolls-Royce/Allison defendants, the MDHI defendants and defendant Superior, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field resulting in serious injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT X

### WRONGFUL DEATH AND SURVIVAL
### DAMAGES BASED ON BREACH OF WARRANTY

### Plaintiffs v. The Extex Defendants, The Rolls-Royce/Allison
### Defendants, The MDHI Defendants and Defendant Superior Air Parts

186.    Plaintiffs incorporate by reference paragraphs 1 through 185 as though set forth at length.

187.    The defendants are liable to plaintiffs on the basis of breach of warranty in that, at all times material hereto, the accident helicopter, the accident engine and/or their component parts were designed, developed, manufactured, assembled, tested, sold, inspected, maintained, repaired and supported with express warranties and/or implied warranties that the accident helicopter, the accident engine and/or their components parts were of fair and average qualities in the trade, were safe and merchantable, and were fit for its ordinary and particular purpose.

188.    The defendants also warranted that the accident helicopter, the accident engine and/or their component parts were free of defects in materials and/or workmanship when in fact they were dangerous and defective in breach of the aforesaid warranties.

189.    When the defendants designed, developed, manufactured, assembled, tested, sold, inspected, maintained, repaired and supported the accident helicopter, the accident engine and/or their component parts, they expressly warranted that the accident helicopter, the

accident engine and/or their component parts were in a condition suitable for safe flight when in fact they were not, thus said express warranty was breached and, as a proximate result of said breach, plaintiffs' decedents suffered injuries resulting in their death.

190.   As a result of the design, development, manufacture, assembly, testing, sale, inspection, maintenance, repair and support of the accident helicopter, the accident engine and/or their component parts by the defendants, there also arose certain warranties implied by law.  Those warranties include merchantability and fitness for a particular purpose, to wit, safe flight.

191.   Plaintiffs' decedents relied upon such warranties in occupying the accident helicopter on June 15, 2003.

192.   The defendants did breach their implied warranties of merchantability in that:

a.   Defendants, merchants in the goods of the type used by plaintiffs' decedents, did not have the same adequately designed, developed, tested, assembled and manufactured;

b.   Said goods were not of fair and average quality in the trade in which the defendants engage;

c.   Said goods were not fit for the ordinary purpose for which said goods were used;

d.   Said goods were not in conformity with, in so far as safety was concerned, those generally used in the trade or business in which the defendants are engaged;

e.   The defendants knew or should have known that the goods were not fit for their ordinary purposes;

f.      Defendants knew or should have known that said goods were defectively designed, developed, manufactured, assembled, tested, sold, inspected, maintained and/or repaired and as such were dangerous to the plaintiffs' decedents and others in their position;

g.      The defendants knew or should have known that said goods were inadequate for the purposes intended and were dangerous to the safety of plaintiffs' decedents and others in their position;

h.      Said goods did not conform to the normal commercial standards of the trade in which the defendants engage.

193.    The defendants did breach their implied warranties of fitness for a particular purpose in that:

a.      The defendants knew or should have known that said goods would be used by plaintiffs' decedents and others in their position;

b.      The defendants knew or should have know that plaintiffs' decedents and others in their position did and would rely upon the defendants to furnish goods which were not defective;

c.      The defendants knew or should have known that the goods were not adequately and properly designed, developed, manufactured, assembled, tested, sold, inspected, maintained, repaired and supported, and therefore would not be fit for the purposes for which plaintiffs' decedents and others in their position would be using them;

d.      The defendants failed to provide a safe and non-defective accident helicopter, accident engine and/or components thereof, which would not cause injury, harm and damage to plaintiffs' decedents and others in their position.

194.   As a direct and proximate result of the breaches of warranty by the Extex defendants, the Rolls-Royce/Allison defendants, the MDHI defendants and defendant Superior, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in serious injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

### COUNT XI

### PUNITIVE DAMAGES

**Plaintiffs v. The Extex Defendants, The Rolls-Royce/Allison
Defendants, The MDHI Defendants And Defendant Superior Air Parts**

195.   Plaintiffs incorporate by reference paragraphs 1 through 194 as though set forth at length.

196.   Long prior to the accident that took the lives of plaintiffs' decedents, the defendants were actually aware of the defects alleged herein and of the very high accident and/or incident rate and/or service difficulty rate, and/or failure rate regarding the accident helicopter, the accident engine and/or their component parts, and other similar models.

197.   Long prior to the accident that took the lives of plaintiffs' decedents, the defendants knew that the continued use of the accident helicopter, the accident engine, and/or the components thereof, would inevitably result in catastrophic failure of the engine with the

substantial likelihood of serious personal injury and/or death to those occupying the helicopter.

198.    Long prior to the accident which took the lives of plaintiffs' decedents, the defendants were aware of a fix and/or fixes which would have corrected the known defects and dangerous conditions in the accident helicopter, accident engine and/or component parts thereof, but willfully, wantonly, knowingly, unjustifiably, outrageously and in conscious disregard of the rights and safety of the plaintiffs, their decedents and the public at large, failed to implement such changes or fixes.

199.    In spite of the defendants' actual knowledge that others had been and/or would likely continue to be injured and/or killed, and actual knowledge that the accident helicopter, the accident engine and/or their component parts were defective, unairworthy, unsafe and unreasonably dangerous, the defendants nonetheless failed to take any adequate and/or reasonable steps to prevent, warn, eliminate or correct the defects alleged herein or otherwise modify, recall, or retrofit the accident helicopter, the accident engine and/or their component parts, all of which was in their capabilities and reasonable to accomplish, as a consequence of which the accident helicopter crashed unnecessarily taking the lives of plaintiffs' decedents.

200.    At all times material hereto, the defendants made decisions relating to the accident helicopter, the accident engine and its components based not on safety but rather based on retaining and/or capturing market share and/or otherwise for economic, not safety, reasons.

201.    The defendants willfully, wantonly, knowingly, unjustifiably, outrageously and in conscious disregard of the rights and safety of the plaintiffs, the plaintiffs' decedents and the public at large, failed to take any reasonable steps to avoid injury to plaintiffs' decedents

and others in their position, even though they knew that their failure to do so would result in and/or create an extreme likelihood of serious bodily injury or death, entitling plaintiffs to punitive damages.

202.    As a direct and proximate result of the defendants' outrageous, willful and wanton misconduct, and conscious and reckless disregard for the rights and safety of plaintiffs' decedents and others in their position, plaintiffs' decedents suffered injury and harm, resulting in and leading to their death, and therefore plaintiffs, their decedents' estates and their survivors and next of kin pray for punitive damages as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for punitive damages in an amount to be determined at trial and for such other and further relief as the court deems just.

## COUNT XII

## WRONGFUL DEATH AND SURVIVAL DAMAGES BASED ON NEGLIGENCE

### Plaintiffs v. Defendant Universal Power

203.    Plaintiffs incorporate by reference paragraphs 1 through 202 as though set forth at length.

204.    Prior to June 15, 2003, defendant Universal Power, by and/or through its agents, servants, workmen and/or employees, undertook to perform certain inspection, maintenance and repair on the accident engine and/or its component parts.

205.    Prior to June 15, 2003, defendant Universal Power owed a duty of care to plaintiffs' decedents to use reasonable care in connection with inspection, maintenance and repair performed on the accident engine and/or its component parts.

206.    Prior to June 15, 2003, defendant Universal Power, with respect to the inspection, maintenance and repair that it performed on the accident engine and/or its component parts, acted, in whole or in part, either individually, and or in its capacity as vendor and/or joint enterpriser with the K&S defendants and/or the Zaremba defendants, and at all times material hereto, acted within the scope of its authority, consent and permission, expressed or implied, and/or within the scope of its employment, agency and/or joint enterprise with the K&S defendants and/or the Zaremba defendants.

207.    At all times material hereto, defendant Universal Power, through its agents, servants, workmen and/or employees, negligently and improperly performed inspection, maintenance and/or repair on the accident engine and/or its component parts, including but not limited to, the performance of Commercial Engine Bulletin (CEB) 1325 issued by the Rolls-Royce/Allison defendants.

208.    The defendant was negligent, by act or omission, and breached its duty of care in that it:

a.    Carelessly, negligently and recklessly maintained the accident engine and/or its component parts;

b.    Carelessly, negligently and recklessly inspected the accident engine and/or its component parts;

c.    Carelessly, negligently and recklessly repaired the accident engine and/or its component parts;

d.    Carelessly, negligently and recklessly installed, reinstalled, reworked and/or reassembled the accident engine and/or its component parts;

e.     Carelessly, negligently and recklessly selected unqualified and inadequate outside vendors to supply parts and materials for the inspection, maintenance and repair being performed on the accident engine and/or its component parts;

f.     Carelessly, negligently and recklessly performed the inspection, maintenance, repair, rework, reinstallation and reassembly as required by CEB 1325;

g.     Knowingly performed the maintenance, inspection, repair, reinstallation, rework and reassembly required by CEB 1325 without having the proper tools, facility and equipment to accomplish the same;

h.     Carelessly, negligently and recklessly selected unqualified and inadequate vendors to perform portions of CEB 1325;

i.     Carelessly, negligently and recklessly maintained poor and inadequate records and paperwork with respect to inspection, maintenance and repair performed on the accident engine and/or its component parts;

j.     Failed to properly and adequately perform and comply with applicable FAA airworthiness directives and/or manufacturer service bulletins, service letters, approved instructions, warnings, maintenance manuals, inspection schedules and service life schedules;

k.     Failed to properly and adequately use and comply with the accepted practices, procedures, techniques and materials when inspecting, maintaining, repairing and reassembling, reworking and reinstalling the accident engine and its component parts;

l.     Unreasonably, improperly and contrary to regulations certifying the accident engine and/or component parts thereof as airworthy;

m.     Failed to adhere to the Federal Aviation Regulations pertaining to inspection, maintenance and repair;

n.      Carelessly, negligently and recklessly, either on its own, or in conjunction with other maintenance facilities, failed to properly and adequately maintain, inspect, repair, service or test the accident engine and/or its component parts;

o.      Provided defective and unsafe component parts and/or improperly installed and/or designed component parts into the accident engine;

p.      Otherwise being negligent under the circumstances;

q.      Such other acts of negligence as will appear during the course of discovery to be liability-producing conduct on the part of this defendant.

209.    As a direct and proximate result of the breach of duties and responsibilities, negligence, carelessness and recklessness of the defendant Universal Power, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field resulting in the injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their surviving next of kin, seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XIII

**WRONGFUL DEATH AND SURVIVAL ACTION
DAMAGES BASED ON STRICT LIABILITY**

**Plaintiffs v. The K&S Defendants, The Zaremba
Defendants and Defendant Universal Power**

210.    Plaintiffs incorporate by reference paragraphs 1 through 209 as though set forth at length.

211.    At all times material hereto, the defendants were in the business of supplying helicopters, helicopter engines and/or helicopter engine components for use in connection with the K&S defendants' FAR Part 135 for hire commercial sightseeing operations and/or in connection with inspection, maintenance and repair related thereto.

212.    On June 15, 2003, the accident helicopter, accident engine and/or their component parts were supplied to plaintiffs' decedents and were being used for the purpose and in the manner for which they were supplied.

213.    At all times material hereto, the accident helicopter, the accident engine and/or their component parts supplied by the defendants were defective in design and/or manufacture, were defective for lack of warnings and instructions, and were in an unreasonably dangerous and unsafe condition, which was a substantial factor in the happening of this accident.

214.    The defects in and the unreasonably dangerous condition of the accident helicopter, the accident engine and/or their component parts supplied by the defendants consisted of, but are not limited to, the following:

a.    Supplying a defectively designed and developed accident helicopter, accident engine and/or their component parts;

b.       Supplying a defectively manufactured accident helicopter, accident engine and/or their component parts;

c.       Failing to warn that they were supplying an accident helicopter, accident engine and/or component parts thereof, which contained defects in design, development and/or manufacture;

d.       Supplying an accident helicopter, accident engine and component parts thereof which was not airworthy;

e.       Supplying the accident helicopter, accident engine and/or component parts thereof, which contained defective and dangerous parts and materials;

f.       Supplying a defectively designed, developed and manufactured accident helicopter and components thereof which was not crashworthy;

g.       Supplying a defectively designed and manufactured helicopter which, in an otherwise survivable crash scenario, burst into flames during the post-crash landing, killing the occupants thereof;

h.       Failing to discover defects in the accident helicopter, accident engine and/or their components parts prior to supplying them for use by plaintiffs' decedents;

i.       Such other defects as will appear during the course of discovery to be liability-producing conduct on the part of these defendants;

215.    At all times material hereto, the accident helicopter, accident engine and the components thereof were in essentially the same condition before the crash as when they left the defendants' control and were supplied to the plaintiffs' decedents, and were used in the foreseeable manner and for the particular purpose which the defendants knew or should have known that the products supplied by them would be used.

216.   As a direct and proximate result of the defects and unreasonably dangerous conditions alleged herein, and the failure to warn of and/or correct these defects, and/or to otherwise retrofit or recall the accident helicopter, the accident engine and/or their component parts by the K&S defendants, the Zaremba defendants, and defendant Universal Power, jointly and/or severally, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field, resulting in serious injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their survivors and next of kin seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XIV

### WRONGFUL DEATH AND SURVIVAL ACTION
### DAMAGES BASED UPON FRAUD AND MISREPRESENTATION

### Plaintiffs v. The Extex Defendants

217.   Plaintiffs incorporate by reference paragraphs 1 through 216 as though set forth at length.

218.   Long prior to June 15, 2003, the Extex defendants represented to the FAA and others that with respect to the PMA engine parts that they designed, developed, manufactured and sold, that such PMA replacement parts were safe, carefully designed, equal to or better than the component parts originally designed and manufactured by the Rolls-Royce/Allison defendants, and that said PMA replacement parts were in all respects better than OEM parts.

219.    At all times material hereto, the representations made by the Extex defendants were false, fraudulent and a material misrepresentation of fact in that said replacement parts were inferior in design, development and manufacture, including omitting critical design and quality assurance processes used and/or incorporated into the product by the Rolls-Royce/Allison defendants.

220.    At all times material hereto, the defendants knew or should have known that the PMA replacement parts they were touting as being equal to or better than those provided by the Rolls-Royce/Allison defendants were in fact defectively and dangerously designed and manufactured, especially since the failure rate of those parts by the Extex defendants' own analysis confirmed that there was no relationship to rates of failure and time in service.

221.    At all times material hereto, the Extex defendants represented to the FAA and users and consumers of its PMA replacement parts, including some or all of the defendants herein, that said parts were in full compliance with the Federal Aviation Regulations with respect to design and manufacture, and that said replacement parts could be safely maintained and inspected in compliance with the OEMs' maintenance manuals and instructions for continued airworthiness when in fact these representations were false, fraudulent and a misrepresentation of material fact.

222.    At all times material hereto, the false and fraudulent misrepresentations by the Extex defendants were made deliberately, intentionally and willfully, without due regard for safety and without due regard for the rights and safety of plaintiffs' decedents and those in the position of plaintiffs' decedents.

223.    Plaintiffs' decedents, and the users and consumers of PMA replacement parts designed, developed, manufactured and sold by the Extex defendants were unaware that the

representations made by the defendants regarding the safety, quality and integrity of the PMA replacement parts sold by the Extex defendants were false and fraudulent, and had they been provided accurate information regarding the quality and integrity of the Extex defendants' PMA replacement parts, plaintiffs' decedents would not have taken the accident flight and some or all of the defendants in this case would not have used and/or supplied the PMA replacement parts manufactured and sold by the Extex defendants.

224.    The crash, injuries, death and resultant damages of plaintiffs' decedents were caused by the Extex defendants as a result of their intentional, reckless and/or negligent misrepresentations.

225.    As a direct and proximate result of the misrepresentations, gross negligence, carelessness and recklessness of the Extex defendants, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field resulting in serious injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their surviving next of kin, seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XV

## PUNITIVE DAMAGES

### Plaintiffs v. The Extex Defendants

226.   Plaintiffs incorporate by reference paragraphs 1 through 225 as though set forth at length.

227.   Long prior to the accident that took the lives of plaintiffs' decedents, the defendants were actually aware of the false, fraudulent and material misrepresentations that they were making with respect to the PMA replacement parts which they designed, developed, manufactured and sold, including the failed compressor adapter coupling in this case.

228.   Long prior to the accident that took the lives of plaintiffs' decedents, the defendants knew that the continued use of PMA replacement parts which they supplied, including the failed compressor adapter coupling in this case, would inevitably result in catastrophic failure of the engine with the substantial likelihood of serious personal injury and/or death to those occupying the helicopter.

229.   In spite of the defendants' actual knowledge that others had been and/or would likely continue to be injured and/or killed on account of their false, fraudulent and material misrepresentations and with actual knowledge that there was no correlation between time in service and rate of failure, the defendants nonetheless failed to take any adequate and/or reasonable steps to prevent, warn, eliminate or correct the defects alleged herein or otherwise modify, recall or retrofit the accident engine and/or its component parts, all of which was in their capabilities and was reasonable to accomplish prior to the accident, as a consequence of which the accident helicopter crashed unnecessarily taking the lives of plaintiffs' decedents.

230. At all times material hereto, the defendants made decisions with respect to their PMA parts, including the failed compressor adapter coupling in this case, for reasons based not on safety, but rather based on retaining and/or capturing market share, and/or otherwise for economic reasons and/or in conjunction with their ongoing battle with the OEMs and, in particular, the Rolls-Royce/Allison defendants.

231. The defendants willfully, wantonly, knowingly, unjustifiably, outrageously, and in conscious disregard of the rights and safety of the plaintiffs, the plaintiffs' decedents and the public at large, failed to take any reasonable steps to avoid injury to plaintiffs' decedents and others in their position, even thought they knew that their failure to do so would result in and/or create an extreme likelihood of serious bodily injury or death, entitling plaintiffs to punitive damages.

232. As a direct and proximate result of the Extex defendants' outrageous, willful and wanton misconduct and conscious and reckless disregard for the rights and safety of plaintiffs' decedents and others in their position, plaintiffs' decedents suffered injury and harm resulting in and leading to their death and therefore plaintiffs, their decedents' estates and their surviving next of kin, pray for punitive damages as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for punitive damages in an amount to be determined at trial and for such other and further relief as the court deems just.

## COUNT XVI

### WRONGFUL DEATH AND SURVIVAL ACTION DAMAGES
### BASED UPON FRAUD AND MISREPRESENTATION

#### Plaintiffs v. The Rolls-Royce/Allison Defendants

233.   Plaintiffs incorporate by reference paragraphs 1 through 232 as though set forth at length.

234.   Long prior to June 15, 2003, the Rolls-Royce/Allison defendants represented to the FAA and others that the accident model/series engine that they designed, developed, manufactured and sold was safe, carefully designed and manufactured, and free of any defects in design and/or manufacture.

235.   Long prior to June 15, 2003, the representations made by the Rolls-Royce/Allison defendants were false, fraudulent and a material misrepresentation of fact in that the accident model/series engine was defective in design, development and manufacture, and was unreasonably dangerous, including but not limited to, having critical defects in design and manufacture related to the compressor assembly, the compressor adapter coupling, the impeller assembly and the shafting system of the engine.

236.   At all times material hereto, the defendants knew or should have known that the accident engine was defectively and dangerously designed and manufactured, especially since the Rolls-Royce/Allison defendants had actual knowledge of numerous compressor adapter coupling failures and/or service difficulties alerting them that there was a problem with premature wear and/or fretting of the compressor adaptor coupling, as well as actual knowledge of failures and/or service difficulties related to the impeller assembly and the shafting system of the engine.

237.    At all times material hereto, and long prior to June 15, 2003, the Rolls-Royce/Allison defendants were aware that design and/or manufacturing changes and/or fixes to the compressor adapter coupling were necessary so as to avoid premature part and/or engine failure, yet failed to share this knowledge and information with the FAA and/or the aviation community.

238.    At all times material hereto, the Rolls-Royce/Allison defendants represented to the FAA and users and consumers that the accident model/series engine and the component parts thereof was in full compliance with the Federal Aviation Regulations with respect to design and manufacture, and that the engine and component parts thereof could be safely maintained and inspected in compliance with the Rolls-Royce/Allison maintenance manuals and instructions for continued airworthiness when in fact these representations were false, fraudulent and a misrepresentation of material fact.  On the contrary, the Rolls-Royce/Allison defendants were aware, prior to June 15, 2003, of numerous premature failures and/or removals of compressor adapter couplings due to fretting that had been experienced with that part in service which in turn could lead to fracture and/or failure of the coupling followed by an immediate and total loss of engine power.

239.    At all times material hereto, the false and fraudulent misrepresentations by the Rolls-Royce/Allison defendants were made deliberately, intentionally and willfully, without due regard for safety and without due regard for the rights and safety of plaintiffs' decedents and those in the position of plaintiffs' decedents.

240.    Plaintiffs' decedents, and the users and consumers of the accident model/series engine designed, developed and sold by the Rolls-Royce/Allison defendants, were unaware that the representations made by the defendants regarding the safety, quality and integrity of

the engine and its component parts sold by the Rolls-Royce/Allison defendants were false and fraudulent, and had they been provided accurate information regarding the safety, quality, and integrity of the engine and its component parts, plaintiffs' decedents would not have taken the accident flight.

241.    The crash injuries, death and resultant damages of plaintiffs' decedents were caused by the Rolls-Royce/Allison defendants as a result of their intentional, reckless and negligent misrepresentations.

242.    As a direct and proximate result of the misrepresentations, gross negligence, carelessness and recklessness of the Rolls-Royce/Allison defendants, the accident helicopter suffered an in-flight engine failure, loss of control and crashed in a hardened lava field resulting in serious injuries to and the death of plaintiffs' decedents, all for which the plaintiffs, their decedents' estates and their surviving next of kin, seek damages, compensation and financial recovery as previously alleged and as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XVII

## PUNITIVE DAMAGES

### Plaintiffs v. The Rolls-Royce/Allison Defendants

243.    Plaintiffs incorporate by reference paragraphs 1 through 242 as though set forth at length.

244.   Long prior to the accident that took the lives of plaintiffs' decedents, the Rolls-Royce/Allison defendants were actually aware of the false, fraudulent and material misrepresentations that they were making with respect to the accident model/series engine, which they designed, developed, manufactured and sold.

245.   Long prior to the accident that took the lives of plaintiffs' decedents, the Rolls-Royce/Allison defendants knew that the continued use of the accident model/series engine, including but not limited to, the continued use of compressor adapter couplings of the type and/or design incorporated into the accident engine, would inevitably result in catastrophic failure of the engine with the substantial likelihood of serious personal injury and/or death to those occupying the helicopter, regardless whether said type and/or design was an OEM design or a PMA replacement part.

246.   In spite of the defendants' actual knowledge that others had been and/or would likely continue to be injured and/or killed on account of their false, fraudulent and material misrepresentations and in spite of the defendants' actual knowledge that there had been numerous prior failures of the compressor adapter coupling and numerous premature removals of that component part, the defendants nonetheless failed to take any adequate and/or reasonable steps to prevent, warn, eliminate or correct the defects alleged herein or otherwise modify, recall or retrofit the accident engine and/or its component parts, all of which was in their capabilities and was reasonable to accomplish prior to the accident, as a consequence of which the accident helicopter crashed unnecessarily taking the lives of plaintiffs' decedents.

247.   At all times material hereto, the Rolls-Royce/Allison defendants made decisions with respect to the accident model/series engine and the component parts thereof,

including the compressor adapter coupling, for reasons based not on safety, but rather based on retaining and/or capturing market share, and/or otherwise for economic reasons and/or in conjunction with their ongoing battle with the PMA industry and, in particular, the Extex defendants.

248. The defendants willfully, wantonly, knowingly, unjustifiably, outrageously, and in conscious disregard of the rights and safety of the plaintiffs, the plaintiffs' decedents and the public at large, failed to take any reasonable steps to avoid injury to plaintiffs' decedents and others in their position, even thought they knew that their failure to do so would result in and/or create an extreme likelihood of serious bodily injury or death, entitling plaintiffs to punitive damages.

249. As a direct and proximate result of the Rolls-Royce/Allison defendants' outrageous, willful and wanton misconduct and conscious and reckless disregard for the rights and safety of plaintiffs' decedents and others in their position, plaintiffs' decedents suffered injury and harm resulting in and leading to their death and therefore plaintiffs, their decedents' estates and their surviving next of kin, pray for punitive damages as permitted by applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for punitive damages in an amount to be determined at trial, and for such other and further relief as the court deems just.

## COUNT XVIII

## SURVIVAL CLAIMS

### Plaintiffs v. All Defendants

250.    Plaintiffs incorporate by reference paragraphs 1 through 249 as though set forth at length.

251.    Both prior and subsequent to the impact in and from this crash, the plaintiffs' decedents all experienced severe emotional distress, physical and mental injury, and fear of impending death that caused them tremendous conscious pain and suffering before and up to the time of their death.

252.    Accordingly, plaintiffs and plaintiffs' decedents' estates seek compensation for pre-impact pain and suffering, as well as post-impact pain and suffering prior to death pursuant to their decedents' survivorship rights as set forth pursuant to Pennsylvania law and/or any other applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XIX

## WRONGFUL DEATH

### Plaintiffs v. All Defendants

253.    Plaintiffs incorporate by reference paragraphs 1 through 252 as though set forth at length.

254.    As a result of the severe emotional distress and physical and mental injuries as more particularly set forth above, plaintiffs' decedents were killed as a result of the crash of the accident helicopter.

255.    Plaintiffs are all proper heirs, surviving next of kin and/or dependents of decedents James A. Thomas, Jody A. Laughman and Nicole L. Laughman at the time of this accident, and therefore seek compensation for their decedents' wrongful death pursuant to Pennsylvania law and/or any other applicable law.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XX

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### Plaintiffs v. All Defendants

256.    Plaintiffs incorporate by reference paragraphs 1 through 255 as though set forth at length.

257.    Plaintiffs suffered severe and devastating emotional distress as a result of James A. Thomas', Jody A. Laughman's and Nicole L. Laughman's catastrophic and fatal injuries, all of which were proximately caused by the breaches, tortious conduct and/or negligent acts and/or omissions of the defendants, all of which entitles plaintiffs to compensation for their emotional distress in amounts to be shown and/or determined at trial.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars

($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## COUNT XXI

## LOSS OF CARE AND COMPANIONSHIP

### Plaintiffs v. All Defendants

258.    Plaintiffs incorporate by reference paragraphs 1 through 257 as though set forth at length.

259.    As a result of the defendants' breaches, tortious conduct and/or negligent acts and/or omissions, proximately causing the death of their decedents, James A. Thomas, Jody A. Laughman and Nicole L. Laughman, plaintiffs individually, and/or the decedents' beneficiaries and/or next of kin at law, have all suffered the loss of love, support, care and companionship of James A. Thomas, Jody A. Laughman and Nicole L. Laughman, all for which they seek compensation in amounts to be shown and/or determined at trial.

WHEREFORE, plaintiffs pray for judgment against the defendant(s), jointly and severally, for compensatory damages in excess of One Hundred and Fifty Thousand Dollars ($150,000.00) exclusive of interest, costs, and attorneys' fees and for such other and further relief as the court deems just.

## **JURY DEMAND**

Plaintiff demands for a trial by jury.


Dated: _____


                                        Respectfully submitted,


                        _____ REG4398
                        Richard E. Genter, Esquire
                        LAW OFFICES OF RICHARD E. GENTER
                        610 Old York Road, Suite 200
                        Jenkintown, PA  19046
                        (215) 884-8190
                        Attorney for Plaintiffs